UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MOTLALEPULA MODISE, MORWESI MMOLAWA, TIRELO MMOLAWA, *individually and on behalf of all others similarly situated*,     *Plaintiffs*, <br><br> v. <br><br> CAREONE HEALTH SERVICES, LLC, ABEL N. OSAGIE,     *Defendants.* <br><br><br> ABEL N. OSAGIE,     *Counter-Claimant*, <br><br> v. <br><br> MOTLALEPULA MODISE, MORWESI MMOLAWA, TIRELO MMOLAWA,     *Counter-Defendants*. | No. 3:20-cv-00765 (KAD) <br><br><br><br><br><br><br><br> August 5, 2021 |

**MEMORANDUM OF DECISION RE:**
**PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION (ECF NO. 39)**

Kari A. Dooley, United States District Judge:

    Plaintiffs-Counter-Defendants Motlalepula Modise ("Ms. Modise"), Morwesi Mmolawa ("Ms. Mmolawa"), and Tirelo Mmolawa ("Mr. Mmolawa," and, collectively, the "Plaintiffs") commenced this action against Defendant CareOne Health Services, LLC ("CareOne") and Defendant-Counterclaimant Abel N. Osagie ("Osagie," and, collectively, the "Defendants") asserting violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* (the "FLSA"), and the Connecticut Minimum Wage Act, Conn. Gen. Stat. §§ 31-58 *et seq.* (the "CMWA"), on behalf of themselves and all other home health aides ("HHAs") who worked for Defendants in

1

Connecticut from January 13, 2017 to the present. Pending before the Court is Plaintiffs' motion for conditional certification of the FLSA collective action pursuant to 29 U.S.C. § 216(b).[1] (ECF No. 39.) Defendant CareOne is non-appearing but Defendant Osagie has filed an opposition to the motion for conditional certification (ECF No. 40), supporting memorandum (ECF No. 41), and a number of exhibits.[2] For the reasons that follow, Plaintiffs' motion for conditional certification is GRANTED in part and DENIED in part subject to the conditions set forth below.

**Background**

According to the allegations in their complaint (ECF No. 1), Plaintiffs each worked as a HHA or personal care assistant ("PCA")[3] for CareOne, which is owned and operated by Osagie. Ms. Modise worked for Defendants from May 1, 2017 to September 27, 2019; Ms. Mmolawa worked for Defendants from January 13, 2017 to September 21, 2019; and Mr. Mmolawa worked for Defendants from March 2, 2017 to September 14, 2019. (Compl. ¶¶ 9–11.) Plaintiffs allege that "Defendants assign Plaintiffs and other HHAs to be 'live-in' HHAs for their clients," with Plaintiffs' responsibilities including such tasks as assisting clients with their activities of daily living, cooking and serving meals, helping clients bathe and change their clothes, escorting customers to medical appointments, and monitoring clients at all times including via an electronic monitoring device during the night. (*Id.* ¶¶ 28–29.) Plaintiffs understood that they were afforded

---

[1] Also pending before the Court is Plaintiffs' motion for default judgment as to CareOne (ECF No. 28), on which the Court has scheduled a damages hearing for October 19, 2021.

[2] In his answer Osagie sought to make binding representations on CareOne's behalf on the grounds that "all of the activities regarding the management of CareOne Health Services were conducted by [Osagie.]" (*E.g.*, Answer ¶ 68, ECF No. 17.) The Court previously reminded Osagie that CareOne may only appear in federal court through a licensed attorney and that Mr. Osagie accordingly may not represent the LLC before this Court. (*See* Order at ECF No. 14; *see also* Order at ECF No. 21.)

[3] The complaint describes Plaintiffs as HHAs but Osagie disputes that Plaintiffs were ever employed as HHAs and instead refers to Plaintiffs as Personal Care Attendants/Assistants or "PCAs." (*See, e.g.*, Answer ¶¶ 1–2, 9–11, 58.) Plaintiffs use the term "HHA" and "PCA" interchangeably for purposes of their motion. (*See* Pls'. Mem. at 1 n.1, ECF No. 39-1.) They emphasize that the FLSA regulations define "domestic service employment" as including both "services performed by employees such as . . . home health aides, [and] personal care aides." *See* 29 C.F.R. § 552.3.

eight hours of sleep time and three one-hour meal breaks per day, resulting in a 13-hour workday. (*Id.* ¶ 34.) For this Plaintiffs allege that they and all other HHAs were paid a flat rate of $140 per day. (*Id.* ¶¶ 30–33.) During a typical week, Plaintiffs worked 13 hours a day for seven days a week, yielding a minimum of 91 hours of work. (*Id.* 35, 37.) However rather than compensate Plaintiffs for 40 hours of work plus 51 hours of overtime as required by the FLSA, Plaintiffs allege that Defendants paid Plaintiffs $980 (*i.e.*, the daily rate of $140 for seven days) for a 91-hour work week. (*Id.* ¶¶ 36–37.) Plaintiffs assert that "Defendants should have calculated overtime by dividing $980 by 91 hours worked, resulting in a regular rate of $10.77 per hour," and that "Defendants should have paid half that rate, or $5.38 per hour, for each . . . Plaintiff[']s 51 hours of overtime, adding $274.38 to each Plaintiff[']s pay for that week." (*Id.* ¶ 38.)

Plaintiffs further allege that Defendants failed to maintain accurate records of Plaintiffs' work time, including by neglecting to account for the interruptions to Plaintiffs' sleep and meal breaks occasioned by their clients' needs. (*Id.* ¶¶ 40–42.) They assert that these interruptions were so frequent that Plaintiffs "were unable to have at least five hours of uninterrupted sleep time per night" and that Defendants were aware of these interruptions but never modified their time sheets to account for them.[4] (*Id.* ¶ 43.) Plaintiffs also allege that Defendants failed to post notices of employees' rights under the FLSA and CMWA, as required by the statutes' implementing regulations. (*Id.* ¶¶ 48–52.)

Based on the foregoing Plaintiffs bring claims under 29 U.S.C. § 216(b) on behalf of themselves and all other HHAs/PCAs who worked for Defendants in Connecticut during the time

---

[4] "Under federal regulations, 'bona fide' sleep breaks of up to eight hours and meal breaks may be excluded from work time when workers have 24-hour shifts, but if the sleeping period 'is interrupted by a call to duty' so that 'the employee cannot get at least 5 hours' sleep during the scheduled period, then the entire time is working time.'" *Headly v. Liberty Homecare Options, LLC*, No. 3:20-CV-00579 (JAM), 2021 WL 2201193, at *3 (D. Conn. June 1, 2021) (quoting 29 C.F.R. § 785.22).

3

period commencing January 13, 2017 and continuing through the date of final judgment in this matter.  (*Id.* ¶ 58.)  They allege that "Plaintiffs and the other HHAs are similarly situated in that they are all subject to Defendants' common plan or practice of designating them as exempt from the overtime requirements of FLSA, when in fact their work is not exempt."  (*Id.* ¶ 59.)  While Plaintiffs also sought to represent a class asserting claims under the CMWA, they recently informed the Court that discovery had revealed that they are unable to satisfy the numerosity requirement of Fed. R. Civ. P. 23(a)(1) and they shall not therefore seek class certification of the state law claims.  (*See* ECF No. 49.)

**Standard of Review**

"The FLSA was designed to protect workers and ensure that they are not subjected to working conditions 'detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being.'"  *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 243 (2d Cir. 2011) (quoting 29 U.S.C. § 202(a)).  "In furtherance of this goal, the FLSA imposes numerous 'wage and hour' requirements, including an overtime provision mandating employers to pay non-exempt employees time-and-a-half for each hour worked in excess of 40 hours per week."  *Lassen v. Hoyt Livery Inc.*, No. 3:13-CV-01529 (JAM), 2014 WL 4638860, at *3 (D. Conn. Sept. 17, 2014) (citing 29 U.S.C. § 207(a)(1)) (footnote omitted).  If an employer violates the FLSA's wage provisions, then the employer is liable for any unpaid compensation.  29 U.S.C. § 216(b).

"Under the FLSA, a plaintiff may bring a 'collective action' for his or her FLSA claims.  Collective actions under the FLSA are actions that allow employees to sue on behalf of themselves and other employees who are 'similarly situated.'"  *Shahriar*, 659 F.3d at 243–44 (quoting 29 U.S.C. § 216(b)).  "[T]o be 'similarly situated' means that named plaintiffs and opt-in plaintiffs

are alike with regard to some material aspect of their litigation. . . . That is, party plaintiffs are similarly situated, and may proceed in a collective, to the extent they share a similar issue of law or fact material to the disposition of their FLSA claims." *Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 516 (2d Cir. 2020) (footnote and internal citation omitted). "The unique FLSA collective differs from a Rule 23 class because plaintiffs become members of the collective only after they affirmatively consent to join it." *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 540 (2d Cir. 2016); *see also* 29 U.S.C. § 216(b) ("No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.").

In *Myers v. Hertz Corp.*, 624 F.3d 537 (2d Cir. 2010), the Second Circuit endorsed a two-step process for certifying collective actions under the FLSA. *See Glatt*, 811 F.3d at 540. "At step one, the district court permits a notice to be sent to potential opt-in plaintiffs if the named plaintiffs make a modest factual showing that they and others together were victims of a common policy or plan that violated the law." *Id.* (citing *Myers*, 624 F.3d at 555). "The 'modest factual showing' cannot be satisfied simply by unsupported assertions, but it should remain a low standard of proof because the purpose of this first stage is merely to determine *whether* 'similarly situated' plaintiffs do in fact exist." *Myers*, 624 F.3d at 555 (internal citations and quotation marks omitted). "At step two, with the benefit of additional factual development, the district court determines whether the collective action may go forward by determining whether the opt-in plaintiffs are in fact similarly situated to the named plaintiffs." *Glatt*, 811 F.3d at 540 (citing *Myers*, 624 F.3d at 555). "The action may be 'de-certified' if the record reveals that they are not, and the opt-in plaintiffs' claims may be dismissed without prejudice." *Myers*, 624 F.3d at 555.

The instant motion implicates step one of the *Myers* analysis. "At this stage, 'the evidentiary standard is lenient[.]'" *Rodriguez v. Almighty Cleaning, Inc.*, 784 F. Supp. 2d 114, 130 (E.D.N.Y. 2011) (quoting *Rubery v. Buth–Na–Bodhaige, Inc.*, 569 F. Supp. 2d 334, 336 (W.D.N.Y. 2008)). "Courts have repeatedly stated that [the FLSA's] 'similarly situated' requirement is 'considerably less stringent' than the requirements for class certification under Rule 23. . . . Courts do not require proof of an actual FLSA violation, but rather that a 'factual nexus' exists between the plaintiff's situation and the situation of other potential plaintiffs." *Id.* (quotation marks and citations omitted). "Generally, courts will conditionally certify a collective action and authorize dissemination of notice upon a 'simple showing' that other employees may also have been subjected to the allegedly improper employment policy. . . . This 'simple showing' requirement can be met by evidence that other employees had similar job requirements and pay provisions." *Lassen*, 2014 WL 4638860, at *4 (quotation marks, alterations, and citations omitted).

At this stage, "the court may not weigh the merits of the underlying claims by resolving factual disputes, deciding substantive issues or making credibility determinations." *Gui Zhen Zhu v. Matsu Corp*, 424 F. Supp. 3d 253, 263 (D. Conn. 2020) (quotation marks and citations omitted). "Accordingly, a collective action should be certified as long as the plaintiffs' allegations 'are sufficient on their face' to support certification—even if such allegations conflict with the account asserted by the defendants." *Id.* at 264. The Court's determination at step one is therefore "typically based on the pleadings, affidavits and declarations submitted by the plaintiffs." *Rodriguez*, 784 F. Supp. 2d at 130 (quotation marks and citations omitted); *accord Gui Zhen Zhu*, 424 F. Supp. 3d at 265 ("Courts routinely grant conditional certification based on the allegations contained in the complaint and affidavits submitted by the named plaintiffs."). Lastly, the Court

6

draws all inferences from this evidence in favor of the Plaintiffs. *Gui Zhen Zhu*, 424 F. Supp. 3d at 263.

**Discussion**

*Conditional Certification*

As discussed above, Plaintiffs allege that they and other HHAs/PCAs "are similarly situated in that they are all subject to Defendants' common plan or practice of designating them as exempt from the overtime requirements of FLSA, when in fact their work is not exempt." (Compl. ¶ 59.) In support of their motion for collective certification, Plaintiffs similarly assert that "Defendants have a common plan or practice of paying the Named Plaintiffs and opt-in plaintiffs a day rate that did not include paying them overtime premium for overtime work at the rate of one and one half of the regular rate of pay." (Pls.' Mem. at 10.) Each of the named Plaintiffs has submitted an affidavit stating that no matter how many days per week he or she worked, he or she was compensated at the flat rate of $140/day. For instance, each Plaintiff states that "[w]hen I worked only 4 days during a workweek, Defendants paid me $140 x 4, or $560 for that workweek," and "[w]hen I worked 7 days during a workweek, Defendants paid me $980 that workweek." (Modise Aff. ¶¶ 16–17, ECF No. 39-11; Ms. Mmolawa Aff. ¶¶ 16–17, ECF No. 39-12; Mr. Mmolawa Aff. ¶¶ 12–13, ECF No. 39-13.) Plaintiffs aver that "Defendants paid all their live-in PCA[s] the same way they paid me, which was $140 for every 24-hour shift we worked." (Modise Aff. ¶ 20; Ms. Mmolawa Aff. ¶ 20; Mr. Mmolawa Aff. ¶ 16.) Plaintiffs also attest that Defendants excluded sleep and meal breaks from every 24-hour shift Plaintiffs worked, and did so for other PCAs despite the absence of any agreement between the parties to exclude such breaks from the hours on which Plaintiffs' compensation was calculated. (Modise Aff. ¶¶ 31–33; Ms. Modise Aff. ¶¶ 35–37; Mr. Modise Aff. ¶¶ 17–19.) Each Plaintiff describes specific examples of the way his or her sleep and/or meal breaks were frequently interrupted by Defendants' clients; each asserts

Osagie was aware of these interruptions but did not offer any way for Plaintiffs to account for this additional uncompensated working time. (Modise Aff. ¶¶ 22–30; Ms. Mmolawa Aff. ¶¶ 24–30; Ms. Mmolawa Aff. ¶¶ 23–35.)

In further support of their claim that other HHAs or PCAs are similarly situated, Plaintiffs offer CareOne's response to discovery served in connection with another matter currently pending against CareOne and Osagie in the Superior Court, *Kgarebe v. Care One Health Services, LLC et al*, Case No. DBD-CV-19-6033296-S (Ct. Sup. Ct. filed Aug. 29, 2019). Therein, CareOne represented through counsel that it has "employed more than 200 individuals from its inception but has not used more than 47 at a single time." (Resp. to Interrog. No. 2, Pls.' Ex. 1, ECF No. 39-2.) Plaintiffs have also attached their pay records, which reflect varying amounts of compensation for each two-week pay period up to a maximum of $1,960.00, which Plaintiffs assert reflect those pay periods in which they worked 14 days at the daily rate of $140. (Pls.' Ex. 2, ECF No. 39-3.) They compare their records to a 2017 payroll review for Lindie Kgarebe, the PCA-plaintiff in the pending Superior Court litigation, which similarly reflects a maximum compensation of $1,960.00 per two-week pay period. (Pls.' Ex. 5, ECF No. 39-6.)

In his responses to Plaintiffs' First Set of Requests for Admission in the instant matter, Osagie acknowledged "that CareOne paid all 1023z employees the same amount for completing the same number of hours within a week which is defined by the Connecticut Department of Social Services as Sunday to Saturday of the Calendar." (Resp. to Admission No. 1, Pls.' Ex. 4, ECF No. 39-5.) Rather than characterize this as a per diem rate, Osagie explained that he used rates of completion per unit of "1023z," which "is defined as completion of fourteen (14) hours between the hours of 8am of one day and 8am of the next day of the calendar." (*Id.* Resp. No. 2.) Osagie further explained that "[d]uring most of the period that the named plaintiffs worked for CareOne

8

Health Services, 1023z employees were paid for completing 1 unit, 2 units, 3 units, 4 units, 5 units, 6 units and 7 units between Sunday and Saturday, 140, 280, 420, 560, 700, 840, 980 dollars respectively." (*Id.* Resp. No. 3.) According to Osagie, "[i]t is the policy of CareOne Health Services that all 1023z PCAs have 8 hours of sleep of which 5 hours has to be continuous per requirements of the Commissioner of the Connecticut State Department of Social Services," and "1023z employees also get[] 2 further hours of break within each unit of 1023z making total maximum time they can work within a unit of 1023z, 14 hours." (*Id.* Resp. No. 5.) In other words, what Plaintiffs describe as a "per diem" rate, Osagie characterizes as a "unit of 1023 z." But however they might be labeled, the Plaintiffs have established a factual nexus between their situation and that of other PCAs employed by CareOne during the relevant timeframe. Osagie has acknowledged that all "1023z PCAs" were paid in the same manner, which, as discussed above, Plaintiffs allege violates the FLSA.

Osagie's opposition generally contests the merits of Plaintiffs' claims. He represents that "CareOne's Pay structure for 1023z includes overtime and is dependent on the number of units of 1023z completed in a work week which is defined as Sunday to Saturday."[5] (Def's. Mem. at 16.) He also asserts that Plaintiffs were paid more than the required minimum wages under the FLSA and CMWA when accounting for their food and housing costs. (*Id.* at 18–19.) And he disputes that he was aware that any of the Plaintiffs had experienced sleep interruptions with their clients.[6] (*Id.* at 22–23.) In conclusion, Osagie argues that "[s]ince the Plaintiffs have not even shown even

---

[5] Osagie has also attached an unsigned affidavit to his memorandum in which he expands upon these assertions. (ECF No. 41-2.) "The Court cannot rely on the contents of an unsigned and unsworn affidavit," *Meimaris v. Royce*, No. 18-CV-4363 (GBD) (BCM), 2018 WL 9960113, at *2 (S.D.N.Y. Nov. 5, 2018), but even if the Court could consider Osagie's representations therein, they would not change the analysis with respect to the motion for conditional certification.

[6] Osagie additionally challenges the veracity of the named Plaintiffs' claims and Plaintiffs' integrity and performance with respect to their work as PCAs. (*See generally id.* at 6–9.)

9

by modest means that Abel Osagie or CareOne violated [FLSA] or CMWA, their request for [FLSA] certification should be denied." (*Id.* at 25.) However as discussed above, it is not the Court's role at this stage to resolve competing factual representations or reach the merits of the Plaintiffs' claims; rather, "a collective action should be certified as long as the plaintiffs' allegations 'are sufficient on their face' to support certification—even if such allegations conflict with the account asserted by the defendants." *Gui Zhen Zhu*, 424 F. Supp. 3d at 264; *see also Zaldivar v. JMJ Caterers, Inc.*, 166 F. Supp. 3d 310, 322 (E.D.N.Y. 2016) "([A]t the preliminary certification stage, the focus of the court's inquiry is not on the defendants' evidence, but on whether the plaintiff[s] have made their requisite showing. . . . For these reasons, the Court need not consider factual disputes and evidence proffered by Defendants since such information does not impact the Court's determination that conditional certification is warranted here.") (quotation marks and citations omitted).[7]

To the extent Plaintiffs seek to represent members of the collective who were paid a flat daily rate by Defendants that allegedly did not comply with the FLSA's overtime requirements, the Court is satisfied that Plaintiffs have established the requisite "factual nexus" between their situation and that of other HHAs/PCAs employed by Defendants during the relevant time period to support a finding that others were similarly situated at step one of the collective certification. *E.g.*, *Rodriguez*, 784 F. Supp. 2d at 130. In addition, Plaintiffs have demonstrated that their claims share a similar question of law as those of the potential opt-in plaintiffs—including whether

---

[7] Osagie also asserts in his opposition that "1023z is only one of four services CareOne provided to the DSS in addition to other hourly services to other customers." (Def.'s Mem. at 5.) To the extent this argument is advanced as a means of challenging the number of similarly situated PCAs, "[i]t is well-settled that, under the FLSA, 'no showing of numerosity need be made.'" *Zaldivar*, 166 F. Supp. 3d at 323 (quoting *Iglesias-Mendoza v. La Belle Farm, Inc.*, 239 F.R.D. 363, 368 (S.D.N.Y. 2007)) (additional citation omitted). "Rather, 'courts have conditionally certified collective actions under the FLSA where plaintiffs, based on their firsthand observations, identify an approximate class of similarly situated individuals.'" *Id.* (quoting *Romero v. La Revise Associates, L.L.C.*, 968 F. Supp. 2d 639, 646 (S.D.N.Y.2013)) (additional citation omitted).

Defendants were required to pay PCAs overtime premiums as set forth in 29 C.F.R. § 778.112.[8] While Osagie asserts that this regulation "is not applicable to 1023z Service" (Def.'s Mem. at 16–17), this argument again goes to the merits of Plaintiffs' FLSA claims and is not ripe for resolution at this early stage of conditional certification. *See, e.g.*, *Hypolite v. Health Care Servs. of New York Inc.*, 256 F. Supp. 3d 485, 489 (S.D.N.Y. 2017) ("In exercising its discretion at the conditional certification stage, 'the court does not resolve factual disputes, decide substantive issues going to the ultimate merits, or make credibility determinations.'") (quoting *Cunningham v. Elec. Data Sys. Corp.*, 754 F. Supp. 2d 638, 644 (S.D.N.Y. 2010)).

However, to the extent Plaintiffs seek to represent other opt-in plaintiffs whose meal and sleep breaks were interrupted by Defendants' clients and who were not compensated accordingly, Plaintiffs have not set forth sufficient evidence to suggest that other HHAs or PCAs experienced the same interruptions with Defendants' knowledge and were thus similarly situated. *See Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 361 (2d Cir. 2011) ("To establish liability under the FLSA on a claim for unpaid overtime, a plaintiff must prove that he performed work for which he was not properly compensated, and that the employer had actual or constructive knowledge of that work."). Ms. Modise avers in conclusory form that Lindie Kgarebe "had the same similar experience as I had including the fact that . . . she did not sign any agreement for Defendants to exclude sleep time and meal breaks from the hours she worked" (Modise Aff. ¶ 34), but she does not actually represent that Ms. Kgarebe's sleep or meal breaks were interrupted or that Ms. Kgarebe or any other PCAs or HHAs worked through their scheduled breaks without

---

[8] The regulation provides: "If the employee is paid a flat sum for a day's work or for doing a particular job, without regard to the number of hours worked in the day or at the job, and if he receives no other form of compensation for services, his regular rate is determined by totaling all the sums received at such day rates or job rates in the workweek and dividing by the total hours actually worked. He is then entitled to extra half-time pay at this rate for all hours worked in excess of 40 in the workweek."

compensation.  *See Headly*, 2021 WL 2201193, at *4 (denying motion for conditional certification based on similar allegations where named plaintiff's motion "does not contain any non-conclusory allegations that other caregivers employed by defendants had their sleep and meal breaks interrupted or that defendants had notice of those interruptions").  Unlike the manner of compensation for 24-hour shifts, which Defendants administered universally for other PCAs according to the evidence identified by Plaintiffs—including Osagie's own admissions—the question of whether and to what extent any individual PCA is entitled to compensation for sleep or meals worked will invariably turn on the particular circumstances of each PCA and his or her client, and the Defendant's knowledge of the situation.  It would be too speculative for the Court, at this juncture, to determine that other PCAs were similarly situated to the Plaintiffs in this regard.  For instance, while Mr. Mmolawa avers that his sleep was regularly interrupted by one of Defendants' clients, Louis, he states that another client, Anthony, "did not have any problems sleeping at night time" and thus "did not interrupt my sleep."  (Mr. Mmolawa Aff. ¶ 39.)  The motion for collective certification is therefore denied to the extent it is premised on Plaintiffs' effort to represent other PCAs who were allegedly unpaid for break or sleep time during which they performed work or are deemed to have performed work for the Defendants.

### *Proposed Notice and Consent Forms*

Plaintiffs ask the Court to approve their proposed Notice of Collective Action Lawsuit and proposed Consent to Join Action and Authorization to Represent.  (Exs. A and B to Egbarin Decl., ECF Nos. 39-8 and 39-9, respectively.)  "Determining what constitutes sufficient notice to putative plaintiffs in a Section 216(b) collective action is a matter left to the discretion of the district courts."  *Rosario v. Valentine Ave. Disc. Store, Co.*, 828 F. Supp. 2d 508, 518 (E.D.N.Y. 2011) (quoting *Laroque v. Domino's Pizza, LLC*, 557 F. Supp. 2d 346, 356 (E.D.N.Y. 2008)).  "Because

the benefits of a collective action depend on employees receiving notice of its pendency 'so that they can make informed decisions about whether to participate,' district courts are encouraged to monitor the notice process and ensure that the proposed notice is 'timely, accurate, and informative.'" *Gui Zhen Zhu*, 424 F. Supp. 3d at 267 (quoting *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170, 172 (1989)).

First, with respect to the scope of the proposed class, the Notice informs prospective opt—in plaintiffs that "You may be eligible to join this lawsuit if you were employed by the Defendants as a caregiver or personal care assistant from January 13, 2017 through the present and you worked at least one 'live-in' shift in any workweek and you were paid a flat daily rate for your work or Defendants excluded sleep time and meal times from the hours you worked for your live-in shift." (ECF No. 39-8 at 2.) Osagie objects to both the class definition and proposed notice period. He submits that "a lenient definition of the relevant employees for this action is maybe 'PCAs who were employed by CareOne, performed at least one 24-hour shift of 1023z for the period June 2, 2017 to July 16 2020 and could not get their required 8 hours of sleep per 1023z unit.'" (Def.'s Mem. at 5.) As to the relevant timeframe, Osagie argues that because this action was filed on June 2, 2019 and the FLSA contains a two-year statute of limitations, Plaintiffs can only seek back wages from June 2, 2017 through July 16, 2020, which is the day Osagie represents CareOne ceased operations. On the start date, Osagie is correct but, as discussed below, for different reasons. First, this lawsuit was filed on June 2, 2020, not 2019.[9]

The FLSA provides that a cause of action "may be commenced within two years after the cause of action accrued, and every such action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful

---

[9] This appears to be a typographical error as Osagie also indicates that the complaint was served on June 9, 2020.

13

violation may be commenced within three years after the cause of action accrued." 29 U.S.C. § 255(a). "To trigger a three-year limitations period at the conditional certification stage, a plaintiff need only plead that the employer acted willfully." *Gui Zhen Zhu*, 424 F. Supp. 3d at 268. "Even where 'willfulness is disputed, the court applies the three-year statute of limitations for purposes of certifying a representative action.'" *Id*. (quoting *Hamadou v. Hess Corp*., 915 F. Supp. 2d 651, 668 (S.D.N.Y. 2013)). Plaintiffs here allege that Defendants' violation was willful (*e.g.*, Compl. ¶¶ 45, 68, 74), which Osagie disputes, and so the three-year limitations period applies at this stage of the collective certification.[10] In addition, "at the conditional certification stage, courts frequently authorize a more inclusive notice period that 'dates back to three years before the filing of the original complaint'—despite the fact that the statute of limitations runs on the opt-in plaintiffs' individual claims until they formally consent to join the suit." *Gui Zhen Zhu*, 424 F. Supp. 3d at 269 (quoting *Yap v. Mooncake Foods, Inc*., 146 F. Supp. 3d 556, 565 (S.D.N.Y. 2015)) (additional citations omitted). Plaintiffs' notice period dating back to January 13, 2017, or approximately three and a half years before the commencement of this suit, is beyond the three year statute of limitations, and Plaintiffs do not identify any basis upon which the Court can or should extend the notice period further. *See, e.g.*, *Santiago v. Tequila Gastropub LLC*, No. 6-CV-7499 (JMF), 2017 WL 1283890, at *2 (S.D.N.Y. Apr. 5, 2017) ("Given that the statute of limitations for claims under the FLSA is, at most, three years, there is no basis or need to send

---

[10] The Second Circuit recently held "that the mere allegation of willfulness is insufficient to allow an FLSA plaintiff to obtain the benefit of the three-year exception at the pleadings stage," and that a plaintiff must instead "allege facts that permit a plausible inference that the defendant willfully violated the FLSA for that exception to apply." *Whiteside v. Hover-Davis, Inc*., 995 F.3d 315, 323 (2d Cir. 2021). However the Court of Appeals did not address this standard in the context of a motion for conditional certification, and, following *Whiteside*, the courts within this Circuit that have addressed this issue have continued to follow prior precedent that "where willfulness is disputed, it is appropriate to look to the three-year period in determining the scope of a collective action." *Hernandez v. NHR Hum. Res., LLC*, No. 20-CV-3109 (PGG) (DF), 2021 WL 2535534, at *15 (S.D.N.Y. June 18, 2021) (quoting *Curry v. P&G Auditors and Consultants, LLC*, No. 20-CV-6985 (LTS) (SLC), 2021 WL 2414968, at *14 (S.D.N.Y. June 14, 2021)).

14

notice to those who worked at the Daisy more than three years prior to Plaintiff's filing of his Complaint").[11] Therefore the Notice shall reflect a period dating back to June 2, 2017.

The Court notes that "the defendants may still challenge the timeliness of the individual opt-in plaintiffs' claims at the second stage of the certification process, after the close of discovery." *Gui Zhen Zhu*, 424 F. Supp. 3d at 269. Osagie is likewise free to raise, after the close of discovery, the issue of whether any claims exist beyond July 16, 2020, in light of CareOne's alleged closure.[12]

On or before **August 12, 2021**, Plaintiffs shall file amended versions of their proposed Notice and Consent to Join forms consistent with this decision,[13] specifically to include a start date of June 2, 2017 and to delete the many references to claims premised upon unpaid sleep or meal time.

### *Production of Names and Contact Information of Potential Opt-in Plaintiffs*

To facilitate notice to potential opt-in plaintiffs, Plaintiffs ask the Court to "order Defendants to produce, name, last known mailing address, alternate address (if any), all known telephone numbers, E-mail addresses, social security number, dates of employment, and the employee's unique identifying number, within ten days of the Court's Order, in Excel Spreadsheets for all Home Health Aides, are also known and referred to as 'Caregiver[s],' . . . or PCAs who

---

[11] Plaintiffs assert in their complaint that their claims are subject to equitable tolling. (Compl. ¶¶ 47–50.) They do not, however, identify this issue in their motion or otherwise argue that the Court should extend the notice period beyond the three-year statute of limitations on equitable tolling grounds, and so the Court declines to reach an issue that was not raised.

[12] In his objection to Plaintiffs' motion (ECF No. 40) Osagie argues that "any potential Plaintiff should be rightly informed of Osagie's Counterclaim." However the counterclaims concern Plaintiffs' alleged misrepresentations to the Defendants regarding the hours they worked and the health and sleeping conditions of their clients and are therefore germane only to the claims that the Court has declined to certify as part of the collective action. The counterclaims are not relevant to the legal question of whether Defendants failed to pay Plaintiffs time-and-a-half overtime as required by the FLSA and so the Court does not discern a benefit in notifying putative opt-in plaintiffs of their pendency.

[13] The Court further observes that the Notice inaccurately states that this lawsuit was commenced on April 23, 2020, an error that must be corrected as well.

Defendants assigned to work as a 24-hour live in PCAs . . . who Defendants employed during the 3 years prior to June 2, 2020." (Pls.' Mem. at 17.)   "In general, it is appropriate for courts in collective actions to order the discovery of names, addresses, telephone numbers, e-mail addresses, and dates of employment of potential collective members." *Gorzkowska v. Euro Homecare LLC*, No. 3:19-CV-01773 (VAB), 2021 WL 222349, at *8 (D. Conn. Jan. 22, 2021) (quoting *Valerio v. RNC Indus., LLC*, 314 F.R.D. 61, 74–75 (E.D.N.Y. 2016)).   Plaintiffs represent that they seek email addresses and phone numbers so that they may send notices to the potential opt-in plaintiffs via text message and email, because many are live-in caregivers and are frequently re-assigned to different residences.  The Court agrees that this request is reasonable and proper.  *Cf., e.g.*, *Moses v. Griffin Indus., LLC*, No. 18-CV-1200 (ALC) (OTW), 2020 WL 5813737, at *6 (S.D.N.Y. Sept. 30, 2020) (finding notice by email, mail, text message, and social media appropriate where employer exhibited high turnover rate).  "Courts are reluctant, however, to authorize disclosure of private information, such as dates of birth and social security numbers in the first instance and without a showing that the information is necessary for the plaintiff to notify potential opt-ins of the collective action." *Gorzkowska*, 2021 WL 222349, at *8 (quoting *Valerio*, 314 F.R.D. at 75); *see also, e.g.*, *Alli v. Bos. Mkt. Co.*, No. 3:10-CV-4 (JCH), 2011 WL 4006691, at *6 (D. Conn. Sept. 8, 2011) (denying request for disclosure of social security numbers especially in light of plaintiffs' failure to identify any need for this information).

Accordingly, Defendant Osagie is directed to produce within fifteen days of this Order the information requested by Plaintiffs with the exception of social security and employee identification numbers, as Plaintiffs have not identified a specific need for this confidential information.  And although not requested, the Defendant should be sure not to include the date of birth of any present or former employee.

*Distribution of Proposed Notice*

In addition to sending the proposed notice to putative opt-in plaintiffs via mail, email, and text message, Plaintiffs also request that notice be posted at the HHAs' or PCAs' place of employment. As Plaintiffs observe, "[s]uch posting at the place of employment of potential opt-in plaintiffs is regularly approved by Courts, even where potential opt-in plaintiffs will also be notified by mail." *Gui Zhen Zhu*, 424 F. Supp. 3d at 274 (quotation marks and citations omitted). The request is granted and Defendant Osagie is directed to assist as might be necessary to facilitate such posting by Plaintiffs' counsel.

**Conclusion**

For the foregoing reasons, the Plaintiffs' motion for conditional certification is GRANTED in part and DENIED in part. The Court certifies this case as a collective action for "persons who were employed as a Personal Care Assistant or Home Health Aide for CareOne Health Services, LLC and Abel N. Osagie during the time period commencing June 2, 2017 through the present and who worked at least one 'live-in' shift in any workweek and who were paid a flat daily rate for their work."

On or before **August 12, 2021**, Plaintiffs shall submit revised proposed notice and consent forms subject to the directives set forth above. Osagie shall provide Plaintiffs with the requested information regarding prospective opt-in plaintiffs on or before **August 20, 2021.** Plaintiffs shall file with the Court within ten (10) days of the end of the opt-in period a notice identifying the names of all opt-in Plaintiffs.

**SO ORDERED** at Bridgeport, Connecticut, this 5th day of August 2021.

*/s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE