UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_____

| | |
|---|---|
| Motlalepula Modise, Tirelo Mmolawa. and Morwesi Mmolawa  Plaintiffs, | ) ) ) ) |
| and | ) ) |
| Dino Davies  Opt-in Plaintiff, | ) ) ) |
| v. | ) NO. 3:20-CV-00765-SVN ) |
| CareOne Health Services, LLC and Abel N Osagie  Defendants, | ) ) ) ) January 26, 2022 ) |

_____ )

## DEFENDANT'S MEMORADUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGEMENT

Defendant/Counterclaim Plaintiff Abel N. Osagie (hereinafter "Osagie"), hereby submits this memorandum of law in support of his motion for summary judgement as to the claims asserted by plaintiffs Motlalepula Modise ("Modise"), Tirelo Mmolawa ("Mr. Mmolawa"), Morwesi Mmolawa ("Ms. Mmolawa") and opt-in Plaintiff Mr. Dino Davies ("Davies") and partial summary judgement as to his counterclaims: i) Fraudulent/Intentional Misrepresentation, ii) Negligent Misrepresentation, iii) Negligence per Se – Statutory Negligence, and iv) Negligence, against each Counterclaim defendant as a matter of law.

## I.      BACKGROUND

Modise, Mr. Mmolawa, and Ms. Mmolawa, all  Personal Care Assistants/Attendants

(PCA) who worked for CareOne Health Services claiming to be Live-in Home Health Aides ("HHA") who worked for CareOne Health Services, LLC ("CareOne", "CareOne Health Services") brought a class-action complaint against CareOne Health Services, LLC and Abel Osagie with four counts: i) Violation of the FLSA (29 U.S.C. Sec 201 et Seq.), and ii) Violation of the CT Wage Act, C.G.S. Sections 31-58; against CareOne Health Services, LLC and Abel Osagie.

Defendant Abel N. Osagie ("Osagie") has brought a counterclaim action against the named plaintiffs Motlaleputa Modise ("Ms. Modise"), Tirelo Mmolawa ("Mr. Mmolawa"), Morwesi Mmolawa ("Ms. Mmolawa") and Mary or John Doe (representing anyone who claims to belong to the class of allegedly wronged former or current employees who claims to be a class member in this action).


## II.    PROCEDURAL HISTORY

The Plaintiffs commenced this class action by way of a complaint that was filed on June 2, 2020 (ECF 01). On August 5, 2021, Honorable Judge Kari A. Dooley certified the case as a collective action for "persons who were employed as a Personal Care Assistant or Home Health Aide for CareOne Health Services, LLC and Abel Osagie during the time period commencing June 2, 2017 through the present and who worked at least on "live-in" shift in any workweek and who were paid a flat daily rate for their work. On September 2, 2021, Mr. Dino Davies ("Mr. Davis") filed his consent notice to join the action.


## III.   LEGAL REVIEW

### A.  LEGAL STANDARD FOR SUMMARY JUDGEMENT

The purpose of a motion for summary judgment pursuant to Fed.R.Civ.P. 56 is to

assess whether trial is necessary. *See* Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Under Fed.R.Civ.P. 56(c), summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." An issue is genuine if the evidence is such that a reasonable jury could resolve the issue in favor of the nonmoving party. Anderson v. Liberty Lobby, Inc., 277 U.S. 242, 248 (1986). A fact is material if it might affect the outcome of the case under the governing substantive law. *Id.*

The moving party bears the burden of proving that no genuine factual disputes exist.  See Vivenzio v. City of Syracuse, 611 F.3d 98, 106 (2d Cir. 2010). Once the burden has been met, a party who opposes summary judgement "cannot defeat the motion by relying on the allegations in his pleadings, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." Gottlieb v. City of Orange, 84 F.3d 511, 518 (2d Cir. 1996).   Importantly, the Court must construe the filings of a *pro se* litigant liberally. *See* Haines v. Kerner. 404 U.S. 519, 520-21 (1972); Hall v. Bellman, 935 F.2d 1106, 1110 (1Oth Cir.1991).

Moreover, "[w]here the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements become immaterial and cannot defeat a motion for summary judgment." Chandok v. Klessig, 632 F.3d 803, 812 (2d Cir. 2011); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (holding that summary judgment is appropriate when the non-moving party has failed to make a sufficient showing on an essential element for which it bears the burden of proof).

F20.01.034v.2

**B.  THE FLSA**

The Fair Labor Standard Act ("FLSA") generally requires that employers pay time-and-a-half wage rates for hours that an employee works beyond the regular 40-hour work week, 29 U.S.C. §207(a).  In 2013, the U.S. Department of Labor ("USDOL") promulgated a new regulation 29 C.F.R. §552.109, which expanded the class of workers eligible for overtime pay under the FLSA.  Prior to the issuance of this regulation, the FLSA overtime pay requirements did not apply to companionship service workers whose services were provided by means of a third-party employer like CareOne.  See Kinkead v. Humana at Home, Inc, 450 F. Supp. 3d 162 (D. Conn. 2020).  The new regulation eliminated this exemption effective January 1, 2015. Ibid.

As the Second Circuit explained in Young v. Cooper Cameron Corp., 586 F.3d 201, 207 (2d Cir. 2009), "[a]n employer willfully violates the FLSA when it 'either knew or showed reckless disregard for the matter of whether its conduct was prohibited by' the Act. Mere negligence is insufficient. The effect of a willfulness finding is to extend the statute of limitations period from two to three years.  See 29 U.S.C. 255(a). The burden is on the employee to show willfulness." (citing  McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988); Herman v. RSR Sec. Svcs. Ltd., 172 F.3d 132, 141 (2d Cir.1999)).

The Fifth and Eleventh Circuits have held that the Secretary misconstrued the statute by adding the "voluntary and uncoerced" requirement into the *FLSA*. See Davis Brothers, Inc. v. Donovan, 700 F.2d 1368, 1370 (11th Cir. 1983) (holding that because the *FLSA* focuses on the actions of the employer, not the *employee*, the Secretary was without authority to require that acceptance of meals be voluntary); Donovan v. Miller Properties, Inc., 711 F.2d 49, 50 (5th Cir. 1983) (holding that the Eleventh Circuit's interpretation in Davis Brothers was correct and that the "voluntary and uncoerced"

language in the regulation was not within the Secretary's *FLSA* implementation power).
See <u>also Monson v. Marie's Best Pizza, Inc</u>., 2014 Ill. App. 130979 (Ill. App. Ct. 2014).

i.    **Day rates and Job rates 29 C.F.R. Sec. 778.112**

   If the employee is paid a flat sum for a day's work or for doing a particular job, without regard to the number of hours worked in the day or at the job, and if he receives no other form of compensation for services, his regular rate is determined by totaling all the sums received at such day rates or job rates in the workweek and dividing by the total hours actually worked. He is then entitled to extra half-time pay at this rate for all hours worked in excess of 40 in the workweek.

ii.   **Introductory Statement(b) 29 C.F.R. Sec. 778.112**

   The Department recognizes that compensation practices can vary significantly and will continue to evolve in the future. The Department also recognizes that it is not feasible to address all of the various compensation and benefits arrangements that may exist between employers and employees, both currently and in the future …

iii.  **Recordkeeping requirements 29 C.F.R. Sec. 552.110**

This section reads as follows:

(a)   The general recordkeeping regulations are found in part 516 of this chapter and they require that every employer having covered domestic service employees shall keep records which show for each such employee: (1) Name in full, (2) social security number, (3) address in full, including zip code, (4) total hours worked each week by the employee for the employer, (5) total cash wages paid

each week to the employee by the employer, (6) weekly sums claimed by the employer for board, lodging or other facilities, and (7) extra pay for weekly hours worked in excess of 40 by the employee for the employer. No particular form of records is required, so long as the above information is recorded and the record is maintained and preserved for a period of 3 years.

(b)   In the case of an employee who resides on the premises, the employer shall keep a copy of the agreement specified by § 552.102 and make, keep, and preserve a record showing the exact number of hours worked by the live-in domestic service employee. The provisions of § 516.2(c) of this chapter shall not apply to live-in domestic service employees.

(c)   With the exception of live-in domestic service employees, where a domestic service employee works on a fixed schedule, the employer may use a schedule of daily and weekly hours that the employee normally works and either the employer or the employee may:

(1)   Indicate by check marks, statement or other method that such hours were actually worked; and

(2)   When more or less than the scheduled hours are worked, show the exact number of hours worked.

(d) T h e employer is required to maintain records of hours worked by each covered domestic service employee. However, the employer may require the domestic service employee to record the hours worked and submit such record to the employer.

(e)   No records are required for casual babysitters.

-6-

*[40 FR 7405, Feb. 20, 1975, as amended at 78 FR 60557, Oct. 1,2013]*

iv.   **Live-in domestic service employees. 29 C.F.R. Sec. 552.102**

(a)Domestic service employees who reside in the household where they are employed are entitled to the same minimum wage as domestic service employees who work by the day. However, section 13(b)(21) provides an exemption from the Act's overtime requirements for domestic service employees who reside in the household where employed. But this exemption does not excuse the employer from paying the live-in worker at the applicable minimum wage rate for all hours worked. In determining the number of hours worked by a live-in worker, the employee and the employer may exclude, by agreement between themselves, the amount of sleeping time, meal time and other periods of complete freedom from all duties when the employee may either leave the premises or stay on the premises for purely personal pursuits. For periods of free time (other than those relating to meals and sleeping) to be excluded from hours worked, the periods must be of sufficient duration to enable the employee to make effective use of the time. If the sleeping time, meal periods or other periods of free time are interrupted by a call to duty, the interruption must be counted as hours worked. See regulations part 785, § 785.23.

(b)If it is found by the parties that there is a significant deviation from the initial agreement, the parties should reach a new agreement that reflects the actual facts of the hours worked by the employee.

*[40 FR 7405, Feb. 20, 1975, as amended at 78 FR 60557, Oct. 7, 2013]*

v.   **Posting of Notices. 29 C.F.R. Sec. 516.4**

Every employer employing any employees subject to the Act's minimum wage provisions

-7-

shall post and keep posted a notice explaining the Act as prescribed by the Wage and Hour Division, in conspicuous places in every establishment where such employees are employed so as to permit them to observe readily a copy. Any employer of employees to whom section 7 of the Act does not apply because of an exemption of broad application to an establishment may alter or modify the poster with a legible notation to show that the overtime provisions do not apply. For example: Overtime Provisions Not Applicable to Taxicab Drivers (section 13(b)(17)).

## C.  THE FLSA AND "LIVE-IN" IN CONNECTICUT

The "Connecticut Home Care Program" is the program operated pursuant to section 17b-342 of the Connecticut General Statutes. See Regulation of Connecticut State Agencies ("RCSA") Sec. 17b-342-1(b)(10). The qualifications of the PCA are defined in RCSA §17b-262-596 whereas the Home Health aide is a different type of employee defined by Connecticut statures and are employed by Home Health Care Agency of which CareOne is no longer and supervised by a Registered Nurse('RN"). Herein lies the important distinction between the two. Whereas an RN might pick up on what is happening in the home, a manager of a homemaker Companion agencies relies on the documentations provided by his employee at the home of the consumer – the PCA, what he sees when he visits or discussions with the client, family members, other medical professions, the case manager all of which are limited by the Health Insurance Portability and Accountability Act of 1996 ("HIPPA").

Service code 1023z (PCA per diem) was in existence before USDOL extended FSLA requirements to third party agencies providing companionship type services. Procedure 1023z is defined by the commissioner of the Connecticut Department of Social Services under the power granted to him/her by the state legislature in C.G.S. §17b-428. Service code 1023z is a joint employer scenario (the agency and the consumer) - the employee to assigned to work in the home of the consumer which is not owned by the agency. In most cases, the PCA providing 1023z is the only agency employee at the home of the consumer

-8-

Further per RCSA Sec. 17b-342-3(a)(1), "All home care services provided to individuals under the Connecticut Home Care Program shall be authorized in accordance with procedures established by the department prior to the delivery of the service".  For a consumer to qualify for 1023z, the aide has to be able to have 5 hours of continuous sleep, and further sleep hours that total 3 hours in the visit period.  If a consumer does not meet the requirements of 1023z, it is the prerogative of the DSS to put in place an authorized service.

In response to the changing federal laws, the Connecticut Department of Labor and the Department of Social Services issued continued guidelines - Revised Joint Guidance issued by DSS and CTDOL regarding USDOL's Home Care Final Rule (3/31/2016) interpreting the United States Department of Labor guidelines 29 C.F.R. §785.22, 29 U.S.C 203(m) (See Exhibits 7 and 8 attached to the Local Rule 56 statement) and the USDOL Field Assistance Bulletin No. 2015-1 as it applies to the provision of agency-based live-in services to recipients of the Connecticut Medicaid Home and Community-Based Waivers of which procedure code 1023z is a type.

The above facts become very important because the applicability of prior decisions or decisions from other states is a cautious one because there are many aspects of the "live-in" employee that was not addressed at the federal level.  Individually, states have been proactively making laws to make the USDOL's modifications to the FSLA practical for services in their states.  In Connecticut, the legislature has primarily addressed the situation for the CT Home Care program, farming out the creation of statutory laws for that program to the CTDSS but at the cost that services outside the CT Home Care Program involving the "live-in" are impractical in the state of Connecticut.

In the state of New York for example, they have what is generally referred to the "Rule of 13" where aides (Home Health Aides "HHA" in the state of New York) work 13 hours in a 24-hour period.  In Connecticut, the 1023z is close to that excepts that what is statutory is that the aide ("PCA" in CT) has to be able to sleep 8 hours every day of which 5 has to be continuous.

### D.  THE CMWA

The Connecticut Minimum Wage Act ("CMWA") C.G.S §31-58 et seq provides a remedy

for an employee who has received less than the minimum fair wage, namely, recovery in a civil

action of "(i) twice the full amount of such minimum wage or overtime wage less any amount

actually paid to him, or (ii) the employer establishes that the employer had a good faith belief

that the underpayment of such wages was in compliance with the law, the full amount of such

minimum wage or overtime wage less any amount actually paid to him or her by the employer,

with costs and such reasonable attorneys fees as may be allowed by the court."

However, Conn. Gen. Stat §52-596 provides that "[n]o action for the payment of

renumeration for employment payable periodically shall be brought but within two years after the

right of action accrues…"

### E.  FRAUDULENT/INTENTIONAL MISREPRESENTATION AND NEGLIGENT
###     MISREPRESENTATION

The essential elements of an action in common law fraud, as we have repeatedly held,

are that: (1) a false representation was made as a statement of fact; (2) it was untrue and

known to be untrue by the party making it; (3) it was made to induce the other party to act upon

it; and (4) the other party did so act upon that false representation to his injury. . . . Under a

fraud claim of this type, the party to whom the false representation was made claims to have

relied on that representation and to have suffered harm as a result of the reliance." (Citation

omitted; internal quotation marks omitted.) Suffield Development Associates Ltd. Partnership v.

National Loan Investors, LP, 260 Conn. 766, 777-78, 802 A.2d 44 (2002). "In contrast to a

negligent representation, [a] fraudulent representation . . . is one that is knowingly untrue, or

made without belief in its truth, or recklessly made and for the purpose of inducing action upon

-10-

it." (Internal quotation marks omitted.) Kramer v. Petisi, 285 Conn. 674, 684 n.9, 940 A.2d 800 (2008). "This is so because fraudulent misrepresentation is an intentional tort." Id., 684.  See Strum v Harb Development, LLC, 298 Conn. 124 (Conn. 2010).

"The intentional withholding of information for the purpose of inducing action has been regarded . . . as equivalent to a fraudulent misrepresentation.  1 Restatement (Second), Contracts § 161. . .."  (Citations omitted.)  Pacelli Bros. Transportation, Inc. v. Pacelli, 189 Conn. 401, 407 (1983).

The governing principles [of negligent misrepresentation] are set forth in similar terms in § 552 of the Restatement (Second) of Torts (1977): One who, in the course of his business, profession or employment . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." (Citations omitted; internal quotation marks omitted.) *Williams Ford, Inc.* v. *Hartford Courant Co.*, 232 Conn. 559 (Conn. 1995).


## F.  STATUTORY NEGLIGENCE AND COMMON-LAW NEGLIGENCE

Statutory negligence is the failure to conform one's conduct to a duty imposed by the legislature through the enactment of a statute.  Common-law negligence is a violation of the duty to use reasonable care under the circumstances.   A violation of either of these duties is negligence. See Guglielmo v. Klausner Supply Co., 158 Conn. 308, 318 (1969).  Reasonable care is the care that a reasonably prudent person would use in the same circumstances.  Hoelter v. Mohawk Services, Inc., 170 Conn. 495, 501 (1976).

"The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury." (Internal quotation marks omitted.) Jagger v.

-11-

F20.01.034v.2

Mohawk Mountain Ski Area, Inc., (269 Conn. 672, 687 n. 13, 849 A.2d 813 (2004); Hoelter v.

Mohawk Services, Inc., 170 Conn. 495, 501 (1976).

IV.    ARGUMENTS

        There is no dispute as to the forum state, the state where CareOne is a business, and

hired all of the Plaintiffs.  That state is the state of Connecticut.  The applicable laws that Osagie

had to obey in running his business are those of the Federal government of the United States

and the state of Connecticut.  References to decisions in other states are only relevant as to the

federal laws or where a similarity is evident in the laws of the other states.

        In the state of Connecticut, the only service that an employee of a homemaker

companion agency can legally do, which involves providing personal hygiene services is the

PCA.  These Plaintiffs had access to the staff section of the CareOne website, an EVV guide,

reported PCA tasks as part of their daily reporting and in the case of Mr. Davies, was PCA

certified, they knew or should have known that they were PCAs.  There is no evidence upon

which a fact-finder could reasonably conclude that these Plaintiffs were anything but PCAs.

        CareOne was not a one employee organization like a home-owner employer.  As an

employer, CareOne had the right to control not only the work that has to be done but how it will

be done.  That is the reason these Plaintiffs were considered employees.  They had notice of

the policies of CareOne.  Connecticut is an at-will state.  Employees vote with their feet.  At

anytime during their employment, these Plaintiffs could have opted to leave if they did not like

the policies of CareOne.  By staying, they were subject to the policies of CareOne that we

applied equally to all employees and did not violate the law.

        It has always been the policy of CareOne to obey FLSA for all hourly services and not

pay for the personal time of the workers. This policy is clearly visible in the Employee

Handbook.   When FLSA was modified by USDOL, we extended all of our policies to all of our

-12-

employees.  There was no need to write individual contracts with any employee when it was not a deviation from our established policies.  You are either an employee or a contractor but not both.  Any employee who did not like it, could have walked.  These plaintiffs knew that they were required to work 13 hours in a 24-hour period from their pleadings in this case.  CareOne did not pay for personal time.   That is her policy and inalienable right.

Further 29 U.S.C §203(m) defines "wage" paid to an employee to include the reasonable cost of furnishing such employee with board, lodging, or other facilities, if such board, lodging, or other facilities are customarily furnished by such employer to his employees.  There is no requirement for a written agreement between employer and employee for customary cost or statutory defined non-work hours.

We classified these original Plaintiffs as non-exempt employees but they did not have Social Security numbers and our payroll company made the decision not to process pays for any employee without a social security number.  Osagie decided to give the employees time to sort out their immigration problems during the transition period and in the meantime pay them as if they were1099 contractors. We had no contract agreement with them and they knew that they were employees.

**A)  <u>Whether Osagie paid plaintiffs a flat rates per day as defined by the FSLA</u>**

There ought not to be any confusion in the meaning of the word "flat' in 29 C.F.R. Sec. 778.112**.**  "Flat" is not only used as an adjective to "rate" but the law goes on to add "without regard to the number  of hours worked  in the day or at the job".  Flat as used in the FLSA clearly means not "varying, fixed" for the day for an employee.

In terms of one 24-hour service, it should be obvious that the minimum number of workers you need to complete the service is one.  However, what is the maximum?  Who can bear such a liability?  Can the richest man in the world or for that matter the United States

-13-

government pay a fixed daily rate for a 24-hour service?

It should also be clear that the law does not refer to the total employees completing the day.  The FSLA controls what is paid to each employee and not the total payroll cost of the employer.

There is no dispute in this case that Osagie did not use "flat" in describing the CareOne pay structure for 1023z.   Mr. and Ms. Mmolawa during their deposition testified that they did not understand the meaning of the word" flat" although they used it in the affidavits they filed in this action.  See Osagie's Local Rule 56(a)1 Statement ¶¶ 65 and 80.

For the 1023z, PCAs in a day get at least 8 hours of sleep of which 5 hours have to be continuous.  In addition, at CareOne, they are required to have at least 3 hours of personal time per communications with employees and clients.  This is not unusual, the "Rule of 13" describes such a service in the state of New York and CTDSS allows agencies to define hours of personal time.  It is also true that in 2017 when the State of CT required minimum wage was $10.10, we used 14 hours in calculating the minimum wage needed at the homes of the clients but as the minimum wage went up and the revenue for the state did not sustain a 14 hour pay per day, we went to the advertised 13 hours.

The 13 hours in the day that employees work for 1023z is not the first 13 hours. Working hours vary by day and client situation.  The only calculation that can be done on an hourly basis is for completed units of the live-in services.  The recommendation for doing this calculation is as described in the revised Joint DSS and CTDOL Guidance issued on March 31, 2016 which summarizes the U.S. Department of Labor's final rule (78 FR 60454, 10/1/13) and an earlier one titled "Joint Guidance Issued by DSS, DDS and CTDOL Regarding USDOL's Final Rule Effective January 1, 2015".

Using Housing and Food Data from the home of a 1023z consumer, we would calculate the minimum wage requirement for a workweek, the completion of 1, 2, 3, 4, 5, 6, 7

-14-

units (specified 24-hour period).  We did this for all of our clients and then set a value for the

completion of 1, 2, 3, 4, 5, 6, 7 units in a work week for all of our employees.  See Osagie Local

Rule 56(a)1 ¶¶36-37, 55, 62, 77-78 and 85.

There are reasons why we do not use the exact minimum wages calculated and opt for

a higher number.  The method recommended for taking credit for housing cost is disjointed.  If

an employee does 4 or less days, no credit is taken by the employer for housing cost.  This

results in the calculated wages being less for an employee who does 5 days compared to 4

days.  See Osagie Local Rule 56(a)1 ¶¶36-37, 55, 62, 77-78 and 85.   No reasonable employee

would accept to be paid less for doing 5 days compared to 4 days.  It is also not a fair

proposition.  Secondly, housing data are subjective.  There is nothing like an accurate price of a

home.  A real estate appraiser would define the price of a home as what a willing buyer and

seller agree on.  However, there are ways of estimating the fair price of a home which can vary

depending on the method and the appraiser.  For a renter, we can use the rental price but, in

some places, it can vary too.  Thirdly, many housing and food costs vary from week to week so

at best what we collect are averages.  For any prudent person to describe these data as exact is

ignorance and as the use of their modifications aged, CTDOL began to describe these values

as reasonable and fair values as in section 203(m).  See The Affidavit of Abel Osagie ("Osagie

Aff") attached to Osagie's Local Rule 56(a)1 statement, Exhibit 2-4 attached thereto.

There is nothing flat about these rates.  They can be more aptly described as

stepwise.    You can also describe it as using a more reasonable or fair estimate for each unit of

the workweek and each 1023z location.  These numbers are relative to the minimum wages

estimated.  For uncompleted units, we prorated within the position in a workweek of the

uncompleted unit as CTDSS does in compensating its vendors.  The proration equates to a

twenty-fourth of the wage for the uncompleted unit for each clock-hour completed which means

it varies with the clock hours in each 24-hour period.

-15-

On March 22, 2019 when CareOne employees were paid for the two weeks starting February 24, 2019 and ending March 9, 2019, Mr. Mmolawa was paid a gross wage of $1230.60 for reporting late to work on March 1, 2019.    See Osagie's Local Rule 56(a)1, ¶63. The fraction is clear proof that Mr. Mmolawa was not paid a flat daily rate.

On June 16, 2017, Ms.  Mmolawa was paid a gross wage of $1,825.60 representing her work done between May 21, 2017 and June 3, 2017.  The fraction also occurred because she had an uncompleted unit in the pay period.  See Osagie's Local Rule 56(a)1, ¶79.

Again, on June 14, 2019, Ms. Mmolawa was paid a gross wage of $1,068.20 for the period May 19 to June 1, 2019 for completing 7 units for the week ending May 25, 2019 and 15 hours (instead of the 7 she actually completed) on May 26, 2019 for the week ending June 1, 2019.  See Osagie's Local Rule 56(a)1, ¶81.

1023z employees get fractional amounts in their gross pay because of uncompleted units.  This is part of the CareOne pay system and that of the CTDSS for uncompleted units.  It behooves me to think of why anyone would think that the CareOne pay system for 1023z was flat.


**B)  <u>Whether Osagie paid for overtime to the plaintiffs as required by the FSLA</u>**

Even before the modifications of USDOL to FLSA, CareOne paid overtime per 29 U.S.C. §207(a)(1).

For 1023z, the number of credited hours required for each unit is 13 hours.  As discussed above, in 2017, we used 14 hours for each unit and later the published 13 hours per unit in calculating the minimum wage for completion of 1, 2, 3, 4, 5, 6, 7 days in a workweek. The minimum wage calculation involved paying overtime when the number of hours worked was more than 40 in a workweek.  Overtime was calculated at one and a half times the prevailing minimum wage in the state of Connecticut. See Osagie's Local Rule 56(a)1, ¶109

-16-

Clearly, the 1023z were paid overtime based on the defined CareOne hours per unit of CareOne.  These Plaintiffs were paid using the CareOne rates for doing 1023z.  Anything outside of the defined services for 1023z, they did at their own chagrin and as argued below, in some cases led to the damaging of CareOne and Osagie.  See Osagie Local Rule 56(a)1 ¶¶36-37, 55, 62, 77-78 and 85.    For how Osagie did the calculations, see Osagie 3 Aff, Exhibits 9-1 to 9-18.

While third party agencies are subject to FLSA, the CTDSS consumer who has the housing and food data are not.  They have no contract with the third-party agencies.  While CTDSS earlier (See CTDSS Guidelines identified above), promised to provide to vendors, housing and food data, they only tried it once and because the data were not in the realm of reasonable, they stopped doing it.  Osagie used the best information available to him and calling on his experiences, collected housing and food data in each of the homes of the Plaintiffs.  He not only paid overtime to plaintiffs, he even went higher than what was the obligated minimum wage.  Given the situation, Osagie acted in good faith, going above and beyond the requirements of the law.

**C)  Whether Osagie's met the recordkeeping requirements of the FSLA for these Plaintiffs**

The danger in using quotes from prior court decisions, is that prior to 2015, FSLA did not apply to the type of employees in this suit and many earlier decisions implicitly avoided considering companionship employees who provide 24-hour service in an external location that is not owned by the employer without the presence of any other employees.  The 1023z worker is not the same as an employee working in the factory where there are supervisors who can vet the working hours.

We have key examples in this case:  i) On October 29, 2018, Mr. Mmolawa left his client

F20.01.034v.2

alone at home an went to a court hearing in Waterbury, CT (see Osagie Local Rule 56(a)1 statement ¶64), ii) On September 14, 2019, Mr. Mmolawa abandoned his client to go to a party in the state of New York (see Osagie Local Rule 56(a)1 statement ¶77), and iii) Ms. Mmolawa left Ms. Geri alone at home to do personal chores (see Osagie Local Rule 56(a)1 statement ¶102).  How is the remote agency going to be able to accurately meet the record keeping requirements 29 C.F.R. 552.110 if the employer has that total burden.

Luckily, 29 C.F.R. 552.110(d) states that "[t]he employer is required to maintain records of hours worked by each covered domestic service employee. However, the employer may require the domestic service employee to record the hours worked and submit such record to the employer."

Accurate documentation is a key part of the responsibility of the PCA.  They are required to clock-in every day in the case of 1023z, and there are paper forms used for reporting deviations from normal, or regular papers to document important service facts.  "He said she said" is not how the health care industry works.  You put things in writing.  There is no dispute that there is no written communication between these Plaintiffs and Osagie where they claimed interruptions in their sleep or working more than the required 13 hours within each unit of 1023z. Local Rule 56(a)1 statement ¶¶33,47 and 71.  It is statutory that no services can be provided under the CT Home Care Program without pre-authorization.  There is no evidence anything other than 1023z was authorized for the services that these Plaintiffs provided.

When an employee asks a question, Osagie took the time to put it online so that other employees can learn from it.  All of the plaintiffs failed to visit the CareOne website once, look at the office walls when they visited or ask questions as to how to document their relevant service information.

CareOne has a duty to keep records that are made available to her.  The failure to document the interruptions that these Plaintiffs had is theirs and theirs alone.  In the process,

-18-

they damaged CareOne and Osagie. Osagie met the recordkeeping requirements of FLSA.

**D)** **Whether Osagie should pay the original plaintiffs for the interruptions of their sleep time as per the FSLA**

It is the duty of the PCA to document the extra time they were taking to provide services to their clients.  There is no dispute that these plaintiffs did not provide any written documentation to Osagie regarding the interruptions they experienced.  The plaintiffs did not use code "99" in their daily EVV reporting which would have prompted a CTDSS investigation. As it is, CTDSS did not approve any service beyond 1023z for the consumers that these plaintiffs cared for.  See Osagie's Local 56(a)1 Statement ¶¶34, 49 and 73.  Osagie cannot bill CTDSS for verbal services that is why written documentation is needed.

The plaintiffs violated the terms of their employment and Osagie is not liable for the wrongful acts of these Plaintiffs for which he suffered damages.

**E)** **Whether Osagie met the FSLA poster requirements of the FSLA**

The CareOne facility met the requirements of RCSA §19-13-D79 (this was in CGS in 2008) and was licensed as a Home Care Agency in 2008.  See Osagie Local Rule 56(a)1 statement ¶2.  The License is proof that the CareOne facility met all governmental poster requirements in 2008.  We continued to get the Posters for free from our payroll company and in 2020 had the current version on a prominent wall in our office.  See Osagie Local Rule 56(a)1 statement ¶10.

The places where 1023z employees provide services are not owned by CareOne and the only employee of CareOne assigned there usually for the 1023z service is the PCA. The homes of the 1023z consumers are not facilities or establishments of CareOne.  There is no law granting the right to Osagie to paste posters in the private homes of CT citizens.

-19-

CareOne employees also had access to the required posters on the internet and at the staff section of the CareOne website which these plaintiffs never visited.  See Osagie Local Rule 56(a)1 statement ¶10.

If the plaintiffs failed to see the world around them or do their due diligence and use the resources available to them from CareOne, that is their chagrin.  CareOne and Osagie met their FSLA poster requirements.

**F)  Whether Osagie violated CMWA**

In meeting the FSLA requirements, the minimum wage used was the prevalent one in the state of Connecticut.  Since our 1023z are higher than the calculated minimum wages for 1023z services, Osagie met the requirements of CMWA.  Osagie is also not an employer for CMWA.

**G)  Whether Osagie acted in good faith in his payments to these plaintiffs**

Osagie, despite the failure of CTDSS to provide housing and food data for her consumers to Osagie as promised, used the best data available to him. He even went beyond the minimum wages and paid more. All Homemaker Companion agencies are in the same dilemma with respect to this.   All of these Plaintiffs earned less than they made at CareOne before CareOne.  The Plaintiffs also earned less than what CareOne paid her 1023z employees after they left CareOne.  The Plaintiffs cannot produce any evidence other than "he said, she said" that Osagie knew that they were violating CT State laws and damaging him while they worked for him.

Osagie took the time to check their EVV punch-in data, and remind the employees when they did not punch in.  He did that because of the importance of proper documentation in the CT

-20-

Home Care Program.  He had better things to do than to call non-conforming employees at 8:30 to 10:30 in the morning every day.  These Plaintiffs should have known that proper documentation was important or was told about the reason for the calls when they do not do their duty.

Osagie acted in good faith in dealing with these Plaintiffs.  These Plaintiffs are the ones who violated the duties and trust that Osagie expected from them.

**H)  Whether Ms. Modise is liable to Osagie for i) Fraudulent /Intentional Misrepresentation, and ii) Negligent Misrepresentation**

Ms. Modise stayed in the home of Ms. Ann from April 24, 2017 with the outgoing aide Ms. Lindie Kgarebe ("Ms. Kgarebe") until she took over the job on April 30, 2017. Ms. Modise observed that Ms. Ann had a sleeping problem from the first day she arrived at the home of Ms. Ann.  She discussed the issue with Ms. Kgarebe but never informed Osagie that Ms. Ann had a sleeping problem before she took over the job on April 30, 2017.  Ms. Modise never used code 99 in her daily activity reports, did not submit anything in writing to Osagie or CareOne that her client had a sleeping problem nor did she ask anyone at CareOne how to document that her client had a sleeping problem. See Osagie's Local 56(a)1 statement ¶¶31-34.

Her documentations made it seem that she was providing only authorized services which she knew to be untrue.  Her false documentation was made so that Osagie can continue to accept Ms. Ann as a 1023z client and not a 24-hourly PCA client.

Osagie continued to rely on the false documentation from Ms. Modise to his detriment. Instead of receiving the profit from a 24-hourly service, CareOne received only the profit from the 1023z service which is what ultimately led to this lawsuit and the additional damages. This violation was willful, and wanton.  Ms. Modise is therefore liable to Osagie as the assignee for

CareOne for both Intentional Misrepresentation and Negligent Misrepresentation.

I)   **Whether Ms. Modise is liable to Osagie for i) Negligence per se – Statutory**
     **Negligence,  and ii) Negligence**

One of the duties of a PCA is to document and report accurate activities as part of their employment.  Ms. Modise never used code 99 in her daily activity reports, did not submit anything in writing to Osagie or CareOne that her client had a sleeping problem nor did she ask anyone at CareOne how to document that her client had a sleeping problem. See Osagie's Local 56(a)1 statement ¶¶31-34.

Her providing more than the authorized service by the CTDSS for her client is a violation of RCSA Sec. 17b-342-3(a)(1).  Her failure to document that her sleep was being interrupted by Ms. Ann's need for service misled Osagie to continue to accept the 1023z for her client from CTDSS.

Instead of receiving the profit from a 24-hourly service, CareOne received only the profit from the 1023z service which is what ultimately led to this lawsuit and the additional damages. This violation was willful, and wanton.  Ms. Modise is therefore liable to Osagie as the assignee of CareOne for both Statutory Negligence and Common law negligence.

J)  **Whether Mr. Mmolawa is liable to Osagie for i) Fraudulent /Intentional**
    **Misrepresentation, and ii) Negligent Misrepresentation**

Mr. Mmolawa had been providing services to Mr. Haddad before CareOne was authorized to provide 1023z services to Mr. Haddad.  Mr. Mmolawa knew that Mr. Haddad did not qualify for 1023z before asking Osagie if CareOne accepted state cases and encouraged Mr. Haddad to switch his CT Home Care agency to CareOne.  Mr. Mmolawa did not tell Osagie that Mr. Haddad had a sleeping problem or did not qualify for 1023z before encouraging him to

-22-

accept Mr. Haddad as a client.  Mr. Mmolawa used the same paper PCA Activity Sheet that is used at CareOne to record his activities at Diligent (also called ComForCare).  Mr. Mmolawa never used code 99 in his daily activity reports, did not submit anything in writing to Osagie or CareOne that his client had a sleeping problem nor did he ask anyone at CareOne how to document that his client had a sleeping problem.  See Osagie's Local 56(a)1 statement ¶¶43-48.

Mr. Mmolawa intentionally failed to tell Osagie that his client had a sleeping problem, inducing him to accept Mr. Haddad as a 1023z client so that he can receive the higher wages we paid at CareOne.

Mr. Mmolawa never used code 99 in his daily activity reports, did not submit anything in writing to Osagie or CareOne that Mr. Haddad had a sleeping problem nor did he ask anyone at CareOne how to document that his client had a sleeping problem.  See Osagie's Local 56(a)1 statement ¶47.

His documentations made it seem that he was providing only authorized services which he knew to be untrue.  His false documentation was made so that Osagie can continue to accept Mr. Haddad as a 1023z client and not a 24-hourly PCA client.

Osagie continued to rely on the false documentation from Mr. Mmolawa to his detriment.  Instead of receiving the profit from a 24-hourly service, CareOne received only the profit from the 1023z service which is what ultimately led to this lawsuit and the additional damages.  This violation was willful, and wanton.  Mr. Mmolawa is therefore liable to Osagie as the assignee of CareOne for both Intentional Misrepresentation and Negligent Misrepresentation.


**K)  Whether Mr. Mmolawa is liable to Osagie for i) Negligence per se – Statutory**
**    Negligence, and ii) Negligence**

One of the duties of a PCA is to document and report accurate activities as part of their

employment.  Mr. Mmolawa never used code 99 in his daily activity reports, did not submit anything in writing to Osagie or CareOne that Mr. Haddad had a sleeping problem nor did he ask anyone at CareOne how to document that Mr. Haddad had a sleeping problem. See Osagie's Local 56(a)1 statement ¶¶43-48.

Providing more than the authorized service by the CTDSS for Mr. Haddad is a violation of RCSA Sec. 17b-342-3(a)(1).  His failure to document that his sleep was being interrupted by Mr. Haddad's need for service misled Osagie to continue to accept the 1023z for Mr. Haddad from CTDSS.

Instead of receiving the profit from a 24-hourly service, CareOne received only the profit from the 1023z service which is what ultimately led to this lawsuit and the additional damages.

Another duty imposed on the PCA providing 1023z is to help make the client safer in his home.

In the early hours of October 29, 2018, Mr. Mmolawa left Mr. Haddad in a chair in the apartment and went to a Court hearing in Waterbury, CT.  After Mr. Mmolawa left the apartment, Mr. Haddad fell from the chair where Mr. Mmolawa left him.  Neighbors who heard his cries called 911 and Mr. Haddad was taken to Danbury Hospital.  See Osagie's Local 56(a)1 statement ¶¶52-54.

Again, on September 14, 2019, after consuming four bottles of Heineken beer while on duty, Mr. Mmolawa left Mr. Anthony, went to a party in New York state supposedly in search of food. On September 13, 2019, the day before the accident, Mr. Mmolawa had bought $160.34 worth of groceries using Mr. Anthony's bank card.  On his way back from New York State, Mr. Mmolawa was involved in a one-man car accident when he was thrown from his car to the dividing grass area around Exit 12 on Route 7 going north. See Osagie's Local 56(a)1 statement ¶¶60-61.  These abandonments of his clients are violations of CGS §§17a-412 and 17b-450.  Mr.  Mmolawa also violated these laws when he did not report that his wife was

F20.01.034v.2

violating the laws.

Despite knowing that he was drunk at the time of his accident and that his activities going to New York was not in the course of employment, Mr. Mmolawa filed for Worker's Compensation claims.  The claims were finally dismissed after CareOne's insurer had spent a lot of money defending the claim.  See Osagie's Local 56(a)1 statement ¶¶61.  The insurer failed to renew CareOne's policy and in addition is asking for reimbursement for their legal cost. Mr. Mmolawa's actions are the proximate cause of the damages sustained by Osagie.  They were willful and wanton.  Mr.  Mmolawa is therefore liable to Osagie as the assignee of CareOne for both Statutory Negligence and Common law negligence.

**L)  Whether Ms. Mmolawa is liable to Osagie for i)Fraudulent /Intentional Misrepresentation,  and ii) Negligent Misrepresentation**

Ms.  Mmolawa testified during her deposition that Ms. Geri did not have a sleeping problem.  She however did not provide anything in a written form documenting other interruptions to her sleep to Osagie. See Osagie's Local 56(a)1 statement ¶¶71.

Ms.  Mmolawa was aware that once a CTDSS consumer is admitted to the hospital, care of the consumer transfers to the hospital and the PCA has to clock-out.  Any purported interruption to her sleep after that is her own decision because Ms. Geri was no longer under the care of her and CareOne after the client's care is transferred to the hospital.  See Osagie's Local 56(a)1 statement ¶75.   If we look at the prior authorization for CareOne's care of Ms. Geri (Exhibit 3-14 attached to the Second affidavit of Abel Osagie), there are only two 1225z - one on 5/16/2019 and the other on 5/26/2019). See Osagie 2 Aff, Exhibit 3-14 attached thereto.   These are not the interruptions that is a problem here.

The interruptions that are of issue are the once when Osagie never received notice from Ms. Mmolawa nor CTDSS.  Without documenting those interruptions in writing, the

-25-

documentation of her daily activities made it seem she was providing only authorized services which she knew to be untrue.

Ms. Mmolawa on many occasions left Ms. Geri alone at home to do her personal chores for extended period of times and these should have been documented in written or electronic form.  Ms. Mmolawa never did nor were they reported to Osagie by Ms. Geri while Ms. Mmolawa cared for her.  See Osagie's Local 56(a)1 statement ¶76.

Ms. Mmolawa's documentations made it seem that she was providing only authorized services which she knew to be untrue.  Her false documentation was made so that Osagie can continue to accept Ms. Geri as a 1023z client and pay her for personal hours that were not authorized.

Osagie continued to rely on the false documentation from Ms. Mmolawa to his detriment. Instead of receiving the profit from a 24-hourly service, CareOne received only the profit from the 1023z service which is what ultimately led to this lawsuit and the additional damages. This violation was willful, and wanton.  Ms. Mmolawa is therefore liable to Osagie as an assignee of CareOne for both Intentional Misrepresentation and Negligent Misrepresentation.


**M)** **Whether Ms. Mmolawa is liable to Osagie for i) Negligence per se – Statutory**

       **Negligence,  and ii) Negligence**

One of the duties of a PCA is to document and report accurate activities as part of their employment.  Ms. Mmolawa never indicated that her sleep was been interrupted by calls from Ms. Geri for services in her daily activity reports, did not submit anything in writing to Osagie or CareOne that her sleep was been interrupted nor did she ask anyone at CareOne how to document that her sleep was being interrupted. See Osagie's Local 56(a)1 statement ¶71.

Her providing more than the authorized service by the CTDSS for her Client is a violation of RCSA Sec. 17b-342-3(a)(1).  Her failure to document that her sleep was being interrupted by

-26-

her client's need for service misled Osagie to continue to accept the 1023z for Ms. Geri from CTDSS.  Ms. Mmolawa also knew that her husband Mr. Mmolawa had to go to a court hearing stemming from a domestic dispute while Mr. Mmolawa was working for an elderly person.  She failed to report it.  As a mandated reporter, she is also in violation of CGS §§17a-412 and 17b-450.

Instead of receiving the profit from a 24-hourly service, CareOne received only the profit from the 1023z service which is what ultimately led to this lawsuit and the additional damages.  These damages were willful and wanton.  Ms. Mmolawa is therefore liable to Osagie as the assignee of CareOne for both Statutory Negligence and Common law negligence.

V.      **CONCLUSION**

As discussed earlier, any thorough analysis of this case has to recognize the specificity and the statutory nature of the live-in style provided by the CT Department of Social Service to qualified consumers of the CT Home Care program.  CareOne did not provide live-in to private citizens in the style of 1023z.  These Plaintiffs were adult at the time of the events in this case and have to be treated as such.

There were ample ways for them to have known that their clients were Medicaid and CT Home Care consumers. There is no dispute that Mr. Haddad did not have sufficient money for groceries at times and Mr. Mmolawa was taught how to use the timesheets at Diligent (the same paper one we use at CareOne) given his testimonies in his lawsuit with them.  Mr. Mmolawa was aware of the monthly final situation of Mr. Haddad.  Mr. Mmolawa asked Osagie when he wanted to lure Osagie to take the case of Mr. Haddad if he handled state cases.  Mr. Mmolawa communicated with the case managers at CCCI.  By the time these Plaintiffs were employees of CareOne, we were already using the EVV system that was mandated by CTDSS to use for her consumers.  These are all available at the Staff section of the CareOne website

-27-

starting from when the use of the EVV was mandated in 2016.  They chose to ignore available sources of information.  Any trier of fact would find that Osagie did not violate FLSA in his dealings with them.  As a matter of law, Osagie is entitled to relief as to the FLSA and CMWA claims of these Plaintiffs.

Osagie tried to help these Plaintiffs by giving them time to sort out their immigration problems, paying them more than any other CTDSS vendor in Fairfield county because of CareOne's low overhead, but they chose to neglect their duties and be fraudulent in their dealings with him.  Their misrepresentations and violations of their duties were willful and wanton.  As a matter of law, Ms. Modise, Mr. and Mrs. Mmolawa are each liable to Osagie as to all of his counterclaims.

Since Osagie is the only member of CareOne who interacted with these Plaintiffs and was in charge of managing the day to day operating activities of CareOne, if he is not guilty of violating FLSA and CMWA based on the facts which are not in dispute, CareOne cannot be guilty of violating FLSA and CMWA as a matter of law.  We implore the court to set aside the default judgement against CareOne *sua sponte* and find that CareOne is not guilty of the FLSA and CMWA claims of these plaintiffs.

Respectfully Submitted,

Defendant/Counterclaim Plaintiff,
ABEL OSAGIE

By:     /s/ Abel Osagie
Abel Osagie, Pro Se
28 Ward Drive South,
Danbury, CT 06810
Tel.: (203) 730-0070
Fax: (203) 730-0094
osagienet@aol.com

-28-

F20.01.034v.2

**<u>CERTIFICATE OF SERVICE</u>**

This is to certify that a true and correct copy of the foregoing was filed on the date stated above and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


Defendant/Counterclaim Plaintiff


By:      /s/ Abel Osagie
          Abel Osagie, Pro Se
          28 Ward Drive South,
          Danbury, CT 06810
          Tel.: (203) 730-0070
          Fax: (203) 730-0094
          osagienet@aol.com

F20.01.034v.2