# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MOTLALEPULA MODISE; MORWESI MMOLAWA; TIRELO MMOLAWA; *and all others similarly situated*,      *Plaintiffs*, <br><br> v. <br><br> CAREONE HEALTH SERVICES, LLC; ABEL N. OSAGIE,      *Defendants*. | ) ) ) ) ) ) ) ) ) ) ) | 3:20-CV-765 (SVN) <br><br><br><br><br> November 1, 2022 |

## <u>RULING AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

Sarala V. Nagala, United States District Judge.

Individual Plaintiffs Motlalepula Modise, Morwesi Mmolawa, and Tirelo Mmolawa were formerly employed by CareOne Health Services, LLC ("CareOne"), as personal care assistants ("PCAs") providing live-in care for elderly clients. They brought this collective action against CareOne and Abel Osagie ("Defendant"), the sole owner of the company.[1] Plaintiffs claim that Defendant violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and the Connecticut Minimum Wage Act ("CMWA"), Conn. Gen. Stat. § 31-58 *et seq.*, by failing to properly compensate them for overtime hours worked, including time their sleep was interrupted by the clients' needs. Representing himself, Defendant filed several state law counterclaims arising from Plaintiffs' alleged failure to inform him of times when the clients interrupted Plaintiffs' sleep.

Defendant has now moved for summary judgment with respect to Plaintiffs' FLSA and CMWA claims, as well as his counterclaims. Though Plaintiffs have not specifically moved for

---

[1] CareOne has not appeared in the case, and Plaintiffs' motion for default judgment against it remains pending. ECF Nos. 21, 28. Defendant has attempted to represent CareOne in various proceedings before this Court, and he has been repeatedly advised that he cannot do so. ECF Nos. 14, 21. Accordingly, although CareOne is a named Defendant in this case, the Court will refer to Osagie, the only Defendant with an appearance in the case, as Defendant.

summary judgment, their opposition to Defendant's motion asks the Court to dismiss Defendant's counterclaims.  ECF No. 98 at 11; *see also* Tr. of Oral Arg., ECF No. 118, at 36.  For the following reasons, the Court GRANTS in part and DENIES in part Defendant's motion for summary judgment.  The Court DENIES Plaintiffs' request to dismiss Defendant's counterclaims; however, as explained below, the Court will give both parties an opportunity to respond to the Court's notice that it is considering the entry of summary judgment in Plaintiffs' favor pursuant to Federal Rule of Civil Procedure 56(f) with respect to two of Defendant's counterclaims.

## I.     FACTUAL BACKGROUND

The following factual and legal background regarding in-home care for elderly individuals is relevant to the present action, and is undisputed unless otherwise noted.  Pursuant to a statutory mandate, the Connecticut Department of Social Services ("DSS") implements programs designed to regulate home healthcare and companion service agencies.  *See* Conn. Gen. Stat. § 17b-342; Conn. Agencies Regs. § 17b-342-1.  The agencies must comply with the regulations and procedures and, in turn, DSS reimburses the agencies for certain services provided to eligible clients.  Conn. Agencies Regs. §§ 17b-342-1, 17b-342-2.

One such agency is CareOne, a limited liability company owned and operated by Defendant.  Pls.' Local Rule ("L.R.") 56(a)2 Statement ("St."), ECF No. 97-1, ¶¶ 2–4.  It is licensed by the State of Connecticut to provide home healthcare, homemaker, and companion services.  *Id.*  To do so, CareOne employs PCAs[2] and assigns them to particular elderly clients based on their needs.  Consistent with the DSS regulations, CareOne offers two relevant types of

---

[2] Plaintiffs use the term "PCA" interchangeably with the term "home heath aide" ("HHA"), reasoning that the FLSA applies equally to both types of employees.  ECF No. 98 at 8 n.1.  Defendant maintains that Connecticut law defines a PCA, which does not require medical training or provide medical services, differently than an HHA, which must be supervised by a nurse and can provide medical services.  ECF No. 77-1 at 8.  *Compare* Conn. Agencies Regs. §§ 17b-262-588 and 17b-262-596 (defining and outlining the PCA program requirements), *with* Conn. Agencies Regs. §§ 17b-262-725 and 17b-262-727 (defining and outlining the HHA program requirements).  For the sake of consistency, and without resolving this dispute, the Court will refer to Plaintiffs as PCAs.

services:  one live-in PCA pursuant to DSS Procedure Code 1023z, who provides daytime assistance with the client's daily living needs; or three PCAs who work eight-hour shifts to provide full-time assistance with the client's heightened needs.  *Id.* ¶ 6; *see also* ECF No. 108-5 at 3 (defining the scope of PCA services pursuant to Procedure Code 1023z as "assisting an elder with tasks that the individual would typically do for him/herself in the absence of a disability"). Procedure Code 1023z requires an employer of a PCA providing services pursuant to that code to employ the PCA for no more than thirteen hours per day, so that the PCA can receive at least eight hours of sleep, at least five of which need to be uninterrupted, and three hours of meal break time per day.  As part of the reimbursement for PCA services, DSS provides a questionnaire inquiring whether the client required care consistent with Procedure Code 1023z or a higher level of care, although it is unclear whether the client, the agency, or the PCA completes this form.  ECF No. 108-6.

In the context of live-in PCA services pursuant to Procedure Code 1023z, both the agency and the client "share the supervisory responsibility" with respect to the PCA.  Pls.' L.R. 56(a)2 St. ¶ 11.  Relevant here, CareOne hired Plaintiffs to provide live-in PCA services pursuant to Procedure Code 1023z, although it never executed a formal employment agreement with them. Employees were provided with an employee handbook at the beginning of their employment that outlined certain expectations.  *Id.* ¶ 21; ECF No. 81-2.  In the CareOne office, posters on the wall explained employees' rights under the FLSA.  Pls.' L.R. 56(a)2 St. ¶ 10; ECF Nos. 78-1, 87-4.  It is undisputed that CareOne did not enter into a written agreement with any of the three named Plaintiffs to exclude their sleep time from their compensable hours.  ECF No. 102 at 31 ¶ 14.

Plaintiff Precious Modise ("Modise") was employed by CareOne as a PCA from April 30, 2017, to September 27, 2019.  Pls.' L.R. 56(a)2 St. ¶ 23.  During that time, she lived with her

client, Ann, who provided food and housing for her.  *Id.* ¶¶ 23, 29.  Modise took approximately three breaks for personal time throughout each day, amounting to three hours total.  *Id.* ¶ 30.  It is undisputed that Modise observed that Ann "had a sleeping problem" since beginning to work with her.  *Id.* ¶ 32.  Modise attests that Ann typically went to sleep at 8:00 p.m.; then woke up around 11:00 p.m. and returned to sleep around midnight; then woke up around 2:00 a.m. for about thirty minutes; then woke up again around 5:00 a.m.  Modise Aff., ECF No. 39-11, ¶¶ 26–28.  It is further undisputed that Modise never documented the sleep interruptions in either of the two activity documentation systems provided by CareOne.  Pls.' L.R. 56(a)2 St. ¶ 33.  Modise contends that she orally informed Defendant about Ann's sleeping problems and that Defendant disregarded her concern, Modise Aff. ¶¶ 8, 22, but Defendant contends that Modise never informed him about Ann's sleeping problems, Def.'s L.R. 56(a)1 St., ECF No. 77-2, ¶¶ 32–33.

Plaintiff Tirelo Mmolawa ("T. Mmolawa") was employed by CareOne as a PCA from March 2, 2017, to September 14, 2019.  Pls.' L.R. 56(a)2 St. ¶ 38.  Prior to his employment with CareOne, T. Mmolawa had been providing live-in PCA services to his client, Haddad, through a different agency.  *Id.* ¶ 41.  When Haddad sought PCA services from CareOne in March of 2017, T. Mmolawa was hired by CareOne, and thereafter he continued living with and providing services for Haddad.  *Id.* ¶¶ 40, 51.  T. Mmolawa took breaks throughout the day for meals, smoking, and other personal time.[3]  *Id.* ¶ 50.  T. Mmolawa attests that Haddad typically woke up four or five times each night, but, as with Modise, the parties dispute whether T. Mmolawa orally informed Defendant about Haddad's sleeping problems.  T. Mmolawa Aff., ECF No. 39-13, ¶¶ 23, 26; Pls.'

---

[3] Defendant attests that T. Mmolawa engaged in certain improper activities during his employment.  Specifically, Defendant contends that T. Mmolawa twice left Haddad unattended while he was assigned to provide services, resulting in injuries to Haddad and legal expenses to CareOne.  Pls.' L.R. 56(a)2 St. ¶¶ 52–54, 59–61.  While these alleged incidents do not appear to be relevant to T. Mmolawa's claim for uncompensated wages, they are referenced in Defendant's counterclaims against T. Mmolawa.

L.R. 56(a)2 St. ¶ 47.  It is undisputed that T. Mmolawa did not document Haddad's sleeping problems in either of the two activity documentation systems provided by CareOne.  Pls.' L.R. 56(a)2 St. ¶ 47.  In March of 2019, Defendant reassigned T. Mmolawa to provide services to a different client, who did not experience sleeping problems.  *Id.* ¶ 58.

Plaintiff Morwesi Mmolawa ("M. Mmolawa") was employed by CareOne as a PCA from March 20, 2017, to September 15, 2019.  *Id.* ¶ 68.  During that time, she lived with her client, Geraldine, who provided food and housing for her.  *Id.* ¶¶ 68, 73.  M. Mmolawa took breaks throughout the day for meals, personal hygiene, and phone calls.  *Id.* ¶ 72.  It is undisputed that Geraldine did not have routine sleeping problems.  *Id.* ¶ 71.  M. Mmolawa attests, however, that she had to care for Geraldine overnight in the emergency room twice per month and that she informed Defendant of these visits.  M. Mmolawa Aff., ECF No. 39-12, ¶¶ 27–28.[4]

Turning to the facts surrounding Plaintiffs' wages, it is undisputed that they were paid $1960.00 for every two weeks of work.  ECF No. 102 at 28, ¶ 4 (Defendant admitting that, during the relevant time, Plaintiffs were paid $1960.00 when they worked fourteen days in two workweeks).  The calculation of that wage, however, is hotly disputed.  Plaintiffs attest that they were paid a daily flat rate of $140.00.  Modise Aff. ¶ 15; T. Mmolawa Aff. ¶ 11; M. Mmolawa Aff. ¶ 15.  Mathematically, this is consistent with the undisputed fact that they were paid $1960.00 for every fourteen days of work, given that $1960.00 divided by fourteen equals a daily wage of $140.00.  Plaintiffs further represent that, during the course of their employment, they never received a paystub or other itemized breakdown of their overtime wages or food and housing deductions.

---

[4] In addition to these three named Plaintiffs, another employee, Dino Davies, opted into the collective action, although the record regarding his employment with CareOne is relatively sparse.

Defendant represents that Plaintiffs were not paid a daily flat rate, and that his calculation of Plaintiffs' wages proceeded in the following manner.  First, Defendant would determine the amount of a food and housing credit.  To do so, Defendant would obtain the relevant expenses from the clients, such as their mortgage payment, utility bills, property insurance, and grocery bills.  Tr. of Oral Arg. at 45–47; ECF No. 95-10.  If the clients did not provide him with the actual bills, which appears to have frequently been the case, he would review "certain publications" to determine "what rates are in the area."  *See* Tr. of Oral Arg. at 45.  After ascertaining the clients' food and housing expenses, either actual or approximate, he would calculate a weekly amount and credit that amount to Plaintiffs' wages.  *See id.*; ECF Nos. 95-11, 95-12.  For example, Defendant's records indicate that $469.66 were credited to Modise's weekly wage to account for the food and housing provided by her client Ann.[5]  ECF Nos. 95-11, 95-12.  Defendant did not apply the credit on a weekly basis, however; rather, he divided the weekly food and housing credit into an hourly credit.  The food credit was applied hourly throughout the entire week, but the housing credit applied only to hours above fifty-one hours per week, in other words, each hour of days five through seven of the workweek.  *Id.*  Defendant contends that, as the days progressed in the workweek, the hourly food and housing credit grew commensurately until the final take-home wage for a seven-day workweek, including the overtime wages, equaled $980.00.  *See* ECF No. 102-8; Tr. of Oral Arg. at 61–65.  When multiplied by two, this weekly wage resulted in the undisputed wage of $1960.00 for every two weeks of work.  ECF No. 102-8.  In essence, Defendant contends that Plaintiffs' wages, accounting for a credit in the amount of the food and housing

---

[5] Similarly, Defendant's records indicate that $391.49 was credited to M. Mmolawa's weekly wage to account for the food and housing provided by Geraldine, ECF Nos. 95-19, 95-20; $408.66 was credited to T. Mmolawa's weekly wage to account for the food and housing provided by Haddad, ECF No. 95-14; and $365.96 was credited to T. Mmolawa's weekly wage to account for the food and housing provided by the client to whom he was reassigned, ECF Nos. 95-16, 95-17.

provided by the client, ended up being $1960.00 every two weeks, but not because they earned a flat amount of $140.00 per day.

Part of the dispute in how Plaintiffs' wages were calculated stems from the fact that Defendant did not provide paystubs to Plaintiffs, either in the course of their employment or in discovery.  Tr. of Oral Arg. at 8, 42.  Defendant represents that, during the relevant time period, Plaintiffs were undocumented immigrants and did not have Social Security numbers, and the payroll vendor hired by CareOne "refused to process anybody that did not have a valid Social Security number."  *Id.* at 42; *see also* ECF No. 77-1 at 13; ECF No. 102 at 29, ¶ 7 (Defendant admitting that he provided "no paystubs for the Plaintiffs").  Therefore, Defendant did not generate pay stubs for Plaintiffs.  In support of the present motion, Defendant submitted records that he kept regarding Plaintiffs' weekly wages.  *See, e.g.*, ECF Nos. 81-6, 86-1, 93-2, 95-11, 95-12, 95-14, 95-16, 95-17, 95-19, 95-20.  In the course of Plaintiffs' employment, however, he did not furnish them with these records, or any further information regarding how he calculated the food and housing credit.  ECF No. 102 at 31, ¶ 13.

## II.     PROCEDURAL HISTORY & PRELIMINARY MATTERS

Plaintiffs filed the present four-count action in federal court in June of 2020.  ECF No. 1. Specifically, Plaintiffs asserted one count under the FLSA and one count under the CMWA against each of the named Defendants.  *Id.* at 12–14.  Defendant appeared *pro se* soon thereafter and filed an answer, ECF No. 17, and a sixteen-count counterclaim against the named and future opt-in Plaintiffs, ECF No. 18.  Specifically, Defendant claims that each Plaintiff committed fraud, negligent misrepresentation, negligence, and negligence *per se* or statutory negligence by failing to properly report their working hours and sleep time interruptions and by violating various statutes.  *Id.* at 8–23.

Meanwhile, CareOne failed to appear through counsel.  The Court (Dooley, J.) informed the parties that, as a limited liability company, CareOne could "appear in federal court only through a licensed attorney."  ECF No. 14 (quoting *Lattanzio v. COMTA*, 481 F.3d 137, 140 (2d Cir. 2007) (per curiam)).  After CareOne still had not appeared through counsel, the Court granted Plaintiffs' motion for default entry.  ECF No. 21.  Plaintiffs filed a motion for default judgment in October of 2020, ECF No. 28, which remains pending.

In February of 2021, Plaintiffs moved for conditional certification of the FLSA collective pursuant to 29 U.S.C. § 216(b), which the Court granted in part.  ECF Nos. 39, 54; *Modise v. CareOne Health Servs., LLC*, No. 3:20-CV-00765 (KAD), 2021 WL 3421711, at *1 (D. Conn. Aug. 5, 2021).  Specifically, the Court certified the case "as a collective action for 'persons who were employed as a Personal Care Assistant or Home Health Aide for CareOne Health Services, LLC and Abel N. Osagie during the time period commencing June 2, 2017 through the present and who worked at least one "live-in" shift in any workweek and who were paid a flat daily rate for their work.'"  *Modise*, 2021 WL 3421711, at *8.  Thereafter, one Plaintiff, Davies, opted to join the collective.[6]  ECF No. 57.

In late 2021, the case was transferred to the undersigned and discovery closed.  In January of 2022, Defendant filed the present motion for summary judgment, ECF No. 77, seeking judgment as a matter of law with respect to Plaintiffs' FLSA and CMWA claims and his state law counterclaims.  He also asks the Court to "set aside the default judgment against CareOne *sua sponte* and find that CareOne is not guilty of the FLSA and CMWA claims of these plaintiffs."

---

[6] At oral argument, counsel for Plaintiffs asserted that the single opt-in Plaintiff, Davies, was told by Defendant that "if he joined this lawsuit, he [would be] subject to damages," essentially, that Defendant was "threatening him not to join the lawsuit."  Tr. of Oral Arg. at 38.  Defendant vehemently disputes this assertion.  *Id.* at 40.  The Court notes that counsel for Plaintiffs has not substantiated this claim, nor requested any separate relief arising from the issue. Because counsel did not explain the relevance of this issue to the present motion for summary judgment, the Court will address it no further in this ruling.

ECF No. 77-1 at 28.  The Court denies this final request, given that CareOne still has not appeared through counsel.  Defendant, who is not an attorney, cannot represent CareOne in this action. *Lattanzio*, 481 F.3d at 140 (holding that "a limited liability company . . . may appear in federal court only through a licensed attorney").

After oral argument on the present motion for summary judgment, the Court directed the parties to order the transcript of the argument, which was entered on the docket by the Court Reporter.  ECF Nos. 116, 118.  Thereafter, Defendant filed a "response" to the transcript, indicating that he desired to respond to arguments raised by counsel for Plaintiffs during the oral argument.  ECF No. 119.  The Court explained, however, that the briefing on the pending motion for summary judgment had closed and directed the parties not to file additional briefing regarding the merits of the motion absent leave from the Court.  ECF No. 120.  Defendant promptly filed ECF No. 121, a motion requesting leave to file a response to the transcript.  Before turning to the merits of the motion for summary judgment, the Court considers this request.

Local Rule 7, which governs motion practice in this district, permits a movant and opponent to file memoranda in support or opposition to a motion, respectively, as a matter of right. D. Conn. L.R. 7(a).  Such memoranda must comport with the requirements set forth in the Rule, absent leave from the Court.  *Id.*  The Rule permits a movant to file a reply memorandum, subject to the specified requirements, but it is not required.  D. Conn. L.R. 7(d).  Any party wishing to file a sur-reply brief must obtain leave from the Court, which may be granted "upon a showing of good cause."  *Id.*

Here, Defendant effectively requests permission to file a sur-reply brief to buttress his moving brief, reply brief, and oral argument.  The Court does not find good cause for him to do so, however.  The time for Defendant to respond to the arguments raised by Plaintiffs' counsel

during oral argument was *during* the oral argument, not after.  Indeed, most of the arguments Defendant seeks to raise in his supplemental "response" were adequately conveyed during oral argument.  In addition, Defendant speculates that the Court Reporter "had difficulty understanding what [Defendant] said," ECF No. 121 at 2, but he fails to identify specific portions of the transcript where he feels he was misheard.  Accordingly, the Court DENIES Defendant's motion for leave to file a "response" to the transcript, ECF No. 121.  The Court will consider the merits of his motion for summary judgment based on the memoranda of law that were previously filed, the record, and the oral argument.

### III.   LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that a court "shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  A factual dispute must be both genuine and material to defeat summary judgment, meaning that it "might affect the outcome of the suit under the governing law" and could allow a reasonable jury to return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In considering a motion for summary judgment, a court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021) (citation and internal quotation marks omitted).

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant bears an initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the

absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

A movant "need only point to an absence of proof on [the non-movant's] part, and, at that point,

[the non-movant] must 'designate *specific facts* showing that there is a genuine issue for trial.'"

*Parker v. Sony Pictures Ent., Inc.*, 260 F.3d 100, 111 (2d Cir. 2001) (emphasis added) (quoting

*Celotex Corp.*, 477 U.S. at 324).  If the non-movant fails "to make a sufficient showing on an

essential element of [their] case with respect to which [they have] the burden of proof," then the

movant will be entitled to judgment as a matter of law.  *Celotex Corp.*, 477 U.S. at 323.

Moreover, the Court bears in mind that a *pro se* litigant's filings and motions are liberally

construed to raise the strongest arguments they suggest.  *Erickson v. Pardus*, 551 U.S. 89, 94

(2007); *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013); *see also Tracy v. Freshwater*, 623 F.3d

90, 101 (2d Cir. 2010) (collecting cases regarding the "special solicitude" afforded to *pro se*

litigants).

## IV.     PLAINTIFFS' FLSA CLAIM

### A.     Legal Standard

"The FLSA was designed to protect workers and ensure that they are not subjected to

working conditions 'detrimental to the maintenance of the minimum standard of living necessary

for health, efficiency, and general well-being.'"  *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*,

659 F.3d 234, 243 (2d Cir. 2011) (quoting 29 U.S.C. § 202(a)).  Specifically, the FLSA sets a

minimum hourly wage, a maximum number of weekly work hours, and overtime wage

requirements.[7] 29 U.S.C. §§ 206, 207.  "Under the FLSA, a plaintiff may bring a 'collective action' for his or her FLSA claims," which allows employees "to sue on behalf of themselves and other employees who are 'similarly situated.'"  *Id.* at 243–44 (quoting 29 U.S.C. § 216(b)).

A wage dispute under the FLSA is generally governed by the burden-shifting framework set forth in *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946), *superseded on other grounds by* The Portal-to-Portal Act of 1947, 29 U.S.C. § 251 *et seq.*  An employee who brings a claim for unpaid minimum or overtime wages "has the burden of proving that he performed work for which he was not properly compensated.  The remedial nature of [the FLSA] and the great public policy which it embodies, however, militate against making that burden an impossible hurdle for the employee."  *Id.* at 686–87.  When the employer "has kept proper records of wages, hours and other conditions and practices of employment," as required by the FLSA, the employee can obtain these records in discovery and utilize such records to satisfy his or her burden of proof.  *Id.* at 687.

When the employer fails to keep or produce such records, however, an employee will satisfy his initial burden "if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference."  *Id.*  "An employee's burden to produce sufficient evidence is low and can be met by that employee's recollection alone."  *Arasimowicz v.*

---

[7] Prior to 2015, regulations promulgated by the U.S. Department of Labor ("DOL") provided that employees who provided companionship services or live-in domestic services and were hired by third-party employers were exempt from the FLSA's minimum and overtime wage requirements.  *See Aboah v. Fairfield Healthcare Servs., Inc.*, No. 3:20-CV-763 (SVN), 2022 WL 4448876, at *4 (D. Conn. Sept. 23, 2022) (explaining the history of the companionship and live-in exemptions).  In 2015, the DOL reversed course, and the new regulations require third-party employers of companionship and live-in domestic service providers to pay those employees the minimum and overtime wages required by the FLSA.  *Id.* at *6 (citing 29 C.F.R. § 552.109(a)).  Soon thereafter, the DOL and DSS issued a joint guidance to assist third-party employers of companionship and live-in domestic service providers, including agencies such as CareOne, in complying with the new regulations.  ECF No. 95-4.  As discussed below, Defendant contends that he relied on this guidance when calculating Plaintiffs' wages.

*All Panel Sys., LLC*, 948 F. Supp. 2d 211, 224 (D. Conn. 2013) (citations omitted). *See also Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 362 (2d Cir. 2011) (holding that "it is possible for a plaintiff to meet this burden through estimates based on his own recollection"). If the employee satisfies this initial burden, "[t]he burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Anderson*, 328 U.S. at 687–88. "If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate." *Id.* at 688.

Generally, because the FLSA contains a two-year statute of limitations, a plaintiff may recover lost wages from two years before the filing of the suit. 29 U.S.C. § 255(a). If the employer's violation of the FLSA is willful, however, a plaintiff can recover damages dating back to three years before the filing of the suit. *Id.* An employer who violates the FLSA is generally liable for the unpaid minimum or overtime wages and "an additional equal amount as liquidated damages." *Id.* § 216(b).

Additional legal principles regarding the FLSA are set forth below as relevant.

### B.  The Parties' Arguments

Before examining the merits of the parties' dispute as to the FLSA claim, the Court briefly summarizes their main arguments on this claim. At base, Plaintiffs' complaint alleges that Defendant did not pay overtime as required under the law. Specifically, Plaintiffs contend that they worked at least ninety-one hours per week, and thus should have been paid their regular rate of pay for the first forty hours, and one-and-a-half times their regular rate of pay for the remaining fifty-one hours. Compl., ECF No. 1, ¶ 38. Plaintiffs also allege that their sleep breaks were frequently interrupted by their clients' needs, and that this time worked was not compensated. *Id.*

¶ 43.  Because Plaintiffs were unable to have at least five hours of uninterrupted sleep per night, and because there was no agreement between Plaintiffs and CareOne to exclude interrupted sleep time, they claim that they should have been paid for the entire eight-hour rest period.  *Id.* ¶¶ 21, 40–43.  Additionally, although the complaint does not allege that Defendant improperly deducted excessive amounts for food and lodging provided to Plaintiffs, that has become a central focus of the parties' summary judgment briefing.  Based on these allegations, Plaintiffs claim that Defendant has committed a willful violation of the FLSA.  *Id.* ¶¶ 73–75.

Defendant moves for summary judgment on Plaintiffs' FLSA claim.[8]  In short, Defendant contends that he accurately calculated and paid Plaintiffs' wages and overtime such that he did not violate the FLSA at all, much less willfully.  Specifically, he argues that he appropriately credited against Plaintiffs' wages the value of food and housing provided to Plaintiffs; that Plaintiffs did not tell him that their sleep was being interrupted, so he could not act on those issues; and, accordingly, that he properly calculated Plaintiffs' pay.  Defendant thus contends that there are no genuine issues of material fact, and that he is entitled to judgment as a matter of law.

### C.  Wage & Overtime Calculation

The Court begins with Defendant's contention that he properly calculated Plaintiffs' overtime pay, and finds genuine disputes of material fact that preclude summary judgment in Defendant's favor.  "To establish liability under the FLSA on a claim for unpaid overtime, a plaintiff must prove that he performed work for which he was not properly compensated, and that the employer had actual or constructive knowledge of that work."  *Kuebel*, 643 F.3d at 361 (citing *Anderson*, 238 U.S. at 686–87).  Thus, Plaintiffs' FLSA claim presents two issues for the Court to

---

[8] Defendant appears not to dispute that he falls within the FLSA's expansive definition of an "employer."  *See Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999) (citing 29 U.S.C. § 203(d) and quoting *Falk v. Brennan*, 414 U.S. 190, 195 (1973)).

consider at the summary judgment stage: first, whether Plaintiffs were properly compensated for overtime hours it is *undisputed* that they worked; and second, whether Plaintiffs are entitled to compensation for overtime hours it is *disputed* that they worked. For the reasons that follow, the Court finds genuine disputes of material fact as to both issues.

### 1. *Pay for Undisputed Hours*

First, it is undisputed that Plaintiffs worked more than forty hours per week and were entitled to overtime compensation. Specifically, the undisputed facts are that Plaintiffs typically worked at least thirteen hours per day for seven days per week, for a total of at least ninety-one hours per week. Plaintiffs contend that their daily wage of $140.00 did not reflect proper overtime compensation, whereas Defendant contends that Plaintiffs' biweekly wage of $1960.00 reflected proper overtime compensation. Relevant here, the minimum wage for any occupation in Connecticut, which the parties do not dispute applies here, was $10.10 per hour in 2017 and 2018, then increased to $11.00 per hour in 2019. Conn. Gen. Stat. § 31-58(i)(1). In addition, both the FLSA and CMWA require employers to pay a rate of "one and one-half times the regular rate at which [the employee] is employed" for each hour in excess of forty hours during a workweek. 29 U.S.C. § 207(a)(1); Conn. Gen. Stat. § 31-76c. Although an employer need not compensate employees on an hourly basis, overtime compensation "must be computed on the basis of the hourly rate derived" from whatever basis on which the employees are compensated. 29 C.F.R. § 778.109.

Thus, in order to calculate how much overtime wages were owed to Plaintiffs and whether Defendant properly compensated them, the Court must "first determine the 'regular rate' received by plaintiffs." *Kinkead v. Humana at Home, Inc.*, 450 F. Supp. 3d 162, 178 (D. Conn. 2020) (citing 29 U.S.C. § 207(a)(1)). "Although the FLSA does not expressly define 'regular rate' of

pay, the Supreme Court has determined that it is 'the hourly rate *actually paid* the employee for the normal, non-overtime workweek for which he is employed.'" *Grochowski v. Phoenix Constr.*, 318 F.3d 80, 87 (2d Cir. 2003) (emphasis in original) (quoting *Walling v. Youngerman–Reynolds Hardwood Co.*, 325 U.S. 419, 424 (1945)).  If the employer pays the employee on an hourly basis, then the regular rate is simply the hourly rate.  *Kinkead*, 450 F. Supp. 3d at 178.  On the other hand, if the employer pays the employee on some other basis, such as a daily or weekly rate, then the regular rate "is the hourly rate as calculated by dividing the total sum received . . . in a workweek by the total number of hours actually worked that week."  *Id.* (citing 29 C.F.R. § 778.112).

Plaintiffs contend that Defendant calculated their wages as a flat per-day fee and did not pay them overtime.  Tr. of Oral Arg. at 6.  Defendant counters that Plaintiffs were not paid a flat fee but, rather, wages that accurately took into account overtime and credits for food and lodging. As explained below, genuine issues of material fact remain as to whether Defendant properly calculated Plaintiffs' regular rate of pay as well as the overtime they were due for the hours that it is undisputed they worked.  Thus, Defendant's summary judgment motion cannot succeed.

### a. Flat Rate

Beginning with Plaintiffs' argument regarding their regular rate of pay, Plaintiffs each submitted affidavits stating that they were paid a "flat rate of pay of $140 per day."  Modise Aff. ¶ 15; M. Mmolawa Aff. ¶ 15; T. Mmolawa Aff. ¶ 11.  M. Mmolawa admitted at a deposition, however, that she did not understand the meaning of the word "flat" as it was used in her affidavit, Pls.' L.R. 56(a)2 St. ¶ 80, and T. Mmolawa testified that Defendant had never used the word "flat" in describing the pay system to him, *id.* ¶ 65.  While a plaintiff's statements alone are generally not sufficient to create a disputed fact to survive summary judgment, *see Gottlieb v. Cnty. Of*

*Orange*, 84 F.3d 511, 519 (2d Cir. 1996), here, Plaintiffs contend that basic mathematics supports their argument that they were paid $140.00 as a flat rate per day, given that pay of $980.00 per week divided by seven days equals $140.00 as a flat rate per day.  Plaintiffs further point to documents entitled "Staff Pay Record" submitted by Defendant, which appear to be the closest thing to paystubs Defendant created for Plaintiffs.  *See, e.g.*, ECF Nos. 81-6, 81-7, 81-8, 86-1, 86-2, 86-3, 93-2, 93-3, 93-4.  Plaintiffs claim that these records evince that Defendant did not separate out "straight" time from overtime and, thus, that Defendant did not in fact pay the required overtime.  Indeed, the Staff Pay Record documents consist simply of two columns, "paydates" and "amount" for the corresponding paydate; the documents do not further break down what portion of the "amount" paid on a particular payday was regular time or overtime, suggesting that Defendant did not in fact separate out these categories of pay and, therefore, did not appropriately pay overtime.  *Id.*  Plaintiffs have also submitted a more traditional paystub Defendant provided to another former employee of CareOne who is not a party to this action, as circumstantial evidence that Defendant did not properly pay Plaintiffs overtime.  *See* ECF No. 97-17.  The traditional paystub, Plaintiffs argue, contains fields for rate, hours, and amount, unlike the Staff Pay Record Defendant created for Plaintiffs here; Plaintiffs thus argue that Defendant was capable of producing detailed paystubs that separate out straight time and overtime, and his failure to do so for Plaintiffs demonstrates he did not properly pay them for overtime.  Defendant claims he was unable to produce these more traditional paystubs for Plaintiffs because they were undocumented workers without Social Security numbers, and his payroll company thus would not process payroll for these individuals.  Tr. of Oral Arg. at 42.

In order to fully consider Plaintiffs' argument, the Court must first address Defendant's response.  Defendant argues that, even in the absence of paystubs or more detailed payroll records,

he properly calculated and paid overtime to Plaintiffs.  In particular, he claims he appropriately calculated credit for housing and food provided to Plaintiffs, which, in turn, renders his wage calculations compliant with the FLSA's overtime requirement.  The Court therefore considers this argument next.

*b.*  Food and Housing Credit

The FLSA permits an employer to take a wage credit for a live-in employee's food and housing, subject to certain conditions.  29 U.S.C. § 203(m)(1).  Specifically, the statute defines "wage" to include "the reasonable cost . . . to the employer of furnishing such employee with board, lodging, or other facilities, if . . . customarily furnished by such employer to his employees." *Id.*  Consistent with its statutory mandate, the DOL has promulgated regulations permitting an employer to credit "the actual cost or fair value of furnishing lodging, whichever is less," if such cost or value is different from the prescribed maximum credit, provided that the employer "keep[s], maintain[s], and preserve[s] . . . the records on which they rely to justify such different cost figures." *Id.*; *see also* 29 C.F.R. §§ 516.27(a), 552.100(b), 552.100(d).[9]  *See also* ECF No. 97-9, Field Assistance Bulletin No. 2015-1 (Dec. 17, 2015), at 2 (explaining that an employer who takes a credit for an employee's housing must maintain "accurate records of the costs incurred in furnishing the lodging"); ECF No. 95-4, Revised Joint Guidance Regarding USDOL's Home Care Final Rule (Mar. 31, 2016), at 2 (citing the DOL regulations and advising employers that they "must maintain accurate records of the (actual) costs incurred in furnishing lodging to the employee").  The records must "include itemized accounts showing the nature and amount of any expenditures entering into the computation of the reasonable cost[.]"  29 C.F.R. § 516.27(a)(1).

---

[9] If the § 203(m) food and housing credits "result in the employee receiving less in cash than the applicable minimum hourly wage," then the employer must "maintain records showing on a workweek basis those additions to or deductions from wages."  29 C.F.R. § 516.27(b).

The DOL regulations provide that, if an employer of a live-in domestic service employee fails to maintain these itemized records, the maximum § 203(m) credit the employer may claim is "seven and one-half times the statutory minimum hourly wage for each week" housing is furnished.  29 C.F.R. § 552.100(d).  For purposes of this regulation, the federal minimum hourly wage applies.  Because the statutory federal minimum wage has been $7.25 per hour during the relevant time, 29 U.S.C. § 206(a)(1)(C), the maximum housing credit an employer who fails to maintain adequate records may claim is seven and one-half times that amount per week, which equals $54.38 per week for lodging.  *See also Mmolawa v. Diligent Enters., Inc.*, No. 19-cr-300 (VLB), 2020 WL 7190819, at *9 (D. Conn. Dec. 7, 2020) (explaining that, "in the absence of employer records of the actual cost of the food and lodging, the most the [d]efendants could have deducted as a credit against the minimum wage pursuant to U.S. DOL regulations was seven and a half times the federal minimum wage"); ECF No. 95-4, Revised Joint Guidance Regarding USDOL's Home Care Final Rule (Mar. 31, 2016), at 2.  In addition, an employer may credit a certain amount for meals provided to the employee, which Plaintiffs compute at a maximum of $76.16 per week if the employer does not keep records justifying different meal costs.  *See* 29 C.F.R. § 552.100(c).  In total, then, in the absence of records justifying different costs, an employer may credit a maximum of $130.54 per week for both housing and food.

As noted above, here Defendant's records indicate that he credited Plaintiffs' wages with weekly food and housing expenses that ranged between $300 and $470 per week.  ECF Nos. 95-11, 95-12, 95-14, 95-16, 95-17, 95-19, 95-20.  Defendant's documents supporting the present motion do not place beyond genuine dispute that he properly recorded the actual cost or fair market value of the food and housing credited to Plaintiffs' wages.  Indeed, Defendant's own argument raises disputes as to how he calculated the food and housing credit.  With respect to his client Ann,

he represented that he examined her bills when calculating the food and housing credit, Tr. of Oral Arg. at 47, but he later argued that he did not have a way of obtaining the clients' bills directly to calculate the actual costs because the clients contracted for the services through DSS rather than CareOne, *id.* at 59. *See also* Reply in Supp. of Mot. for Summ. J., ECF No. 101, at 5 ("We as an agency have no way of obtaining receipts for payments we did not make . . . ."). Moreover, to the extent that Defendant calculated this weekly food and housing credit by relying on the actual cost or fair market value of those expenses, he did not submit evidence of that actual cost or fair market value in support of his motion to substantiate his calculations. Nor did he submit evidence indicating that he confirmed which calculation, the actual cost or the fair market value, was less, as required by the DOL regulations. 29 C.F.R. §§ 552.100(c), 552.100(d) (permitting the employer to credit "the actual cost or fair market value" of furnishing food and lodging, "*whichever is less*" (emphasis added)).

The regulations and case law make clear that the burden to demonstrate proper calculation of the § 203(m) credit is on the employer, not the employee. *See Donovan v. New Floridian Hotel, Inc.*, 676 F.2d 468, 474 (11th Cir. 1982) (affirming the district court's holding that an employer bears the burden of proving that he is entitled to the § 203(m) credit); *Estanislau v. Manchester Devs.*, 316 F. Supp. 2d 104, 107 (D. Conn. 2004) (quoting *New Floridian Hotel, Inc.*, 676 F.2d at 475). Here, a reasonable jury could find that Defendant failed to maintain the records required by the DOL regulations to justify use of an amount beyond the otherwise maximum credit allowed by 29 C.F.R. § 552.100(d). Although there are few cases in the Second Circuit addressing this issue, courts in other circuits have held that an employer is not entitled to a § 203(m) credit greater than the regulatory maximum if they fail to meet the recordkeeping requirements to justify the greater credit. *Brock v. Carrion, Ltd.*, 332 F. Supp. 2d 1320, 1326 (E.D. Cal. 2004) ("An employer

must demonstrate compliance with the [FLSA's] provisions in order to be entitled to a credit for the reasonable cost of providing lodging to employees. . . . Courts routinely deny employers offsets under the FLSA for failure to keep adequate records." (collecting cases)); *see also* ECF No. 97-9, Field Assistance Bulletin No. 2015-1 (Dec. 17, 2015), at 7–8 (collecting cases where courts "denied employers' attempts to claim a section 3(m) credit in circumstances in which those employers have not maintained proper records of costs or wage calculations"). *See also Diligent Enters., Inc.*, 2020 WL 7190819, at *10 (denying summary judgment where the defendant "produced no evidence of its computations" regarding the § 203(m) food and housing credit).

Defendant has not proved as a matter of law that he kept sufficient records, such that he was entitled to claim more than the otherwise applicable regulatory maximum. If a jury were to find that Defendant failed to maintain adequate records to substantiate his § 203(m) credit, he would not be entitled to such credit. Thus, this genuine dispute is material to Defendant's liability under the FLSA, and the Court denies his motion for summary judgment regarding the food and housing credit.

Returning to Plaintiffs' argument, particularly in light of the absence of itemized paystubs and records concerning the calculation of the food and housing credit, the Court cannot resolve the factual dispute regarding the calculation of Plaintiffs' wages with respect to the overtime they undisputedly worked. Indeed, despite significant searching in the record, the Court is unable to discern exactly what hourly amounts Defendant claims Plaintiffs earned as their regular and overtime rates of pay. Because a reasonable jury viewing this record could find either Plaintiffs' or Defendant's view of the facts to be accurate, the Court is not in a position to determine what Plaintiffs' regular rate was. Consequently, the Court cannot ascertain if Plaintiffs' overtime wages

were properly calculated with respect to the overtime hours Plaintiffs undisputedly worked, and summary judgment on that issue is not warranted.

### 2. *Pay for Disputed Hours*

In addition, the parties disagree about whether Plaintiffs were entitled to overtime compensation for sleep time that was interrupted by their clients' overnight needs. The Court characterizes these hours as disputed because the parties do not agree that they were hours worked by Plaintiffs.[10]

The legal framework for compensation of sleep time is as follows. In general, the FLSA requires compensation for "work," which includes "time spent performing activities predominantly for the benefit of the employer." *Kinkead*, 450 F. Supp. 3d at 175 (quoting *Reich v. S. New England Telecomms. Corp.*, 121 F.3d 58, 64 (2d Cir. 1997)) (cleaned up). "While the FLSA itself is silent as to whether sleep time is compensable time, the [DOL] has promulgated interpretive rules addressing that exact issue." *Tahirou v. New Horizon Enters., LLC*, No. 3:20-CV-00281 (SVN) (TOF), 2022 WL 510044, at *5 (D. Conn. Feb. 21, 2022) (citation and internal quotation marks omitted). "When an employee is on duty for a shift of less than twenty-four hours, but is allowed to sleep during his shift, 29 C.F.R. § 785.21 regards him as 'working even though he is permitted to sleep . . . when not busy.'" *Id.* (quoting 29 C.F.R. § 785.21). "So long as he is 'required to be on duty,' 'the time is worktime.'" *Id.* (same).

When the employee's shift is twenty-four hours or more, he and his employer 'may agree to exclude . . . a bona fide regularly scheduled sleeping period of not more than 8 hours from hours

---

[10] With respect to the overtime hours it is *undisputed* that Plaintiffs worked, the relevant question, discussed above, is whether Defendant's actual wage calculations comport with the FLSA. With respect to the overtime hours it is *disputed* that Plaintiffs worked, primarily during their designated sleep time, the record indicates that Defendant did not pay Plaintiffs at all for this time. Thus, the relevant question is not whether Defendant's calculations were correct; instead, the relevant questions are whether Plaintiffs indeed worked during their designated sleep time and, if so, whether such work is compensable.

worked,' but only if 'adequate sleeping facilities are furnished by the employer and the employee can usually enjoy an uninterrupted night's sleep.'" *Id.* (quoting 29 C.F.R. § 785.22(a)). If the employee "cannot get at least 5 hours' sleep during the scheduled period the entire time is working time." *Id.* (quoting 29 C.F.R. § 785.22(b)).

The parties dispute various aspects of the sleep time issue, including whether Plaintiffs had sleep interruptions and whether Defendant knew about these alleged interruptions. All three named Plaintiffs claim to have experienced interruptions to their sleep time because of their clients' needs. Modise's client, Ann, routinely woke up several times during the night and required assistance. Pls.' L.R. 56(a)2 St. ¶ 32; Modise Aff. ¶¶ 26–28. T. Mmolawa's client, Haddad, woke up four or five times per night. Pls.' L.R. 56(a)2 St. ¶ 44; T. Mmolawa Aff. ¶¶ 23, 28–32. M. Mmolawa's client, Geraldine, did not experience routine sleep difficulties, but M. Mmolawa attests that Geraldine traveled to the emergency room overnight approximately twice per month and required M. Mmolawa's assistance during those nights. Pls.' L.R. 56(a)2 St. ¶ 71; M. Mmolawa Aff. ¶¶ 27–28. Plaintiffs further claim that because there was no appropriate place to record these interruptions in Defendant's timekeeping system, they did not record them in writing, but they told Defendant about them. Modise Aff. ¶¶ 22–30; T. Mmolawa Aff. ¶¶ 23–35; M. Mmolawa Aff. ¶¶ 24–29.

Defendant contends, by contrast, that Plaintiffs did not tell him about sleep interruptions. Def.'s L.R. 56(a)1 St., ¶¶ 30, 32–33, 44, 47, 50, 58, 72. Defendant further argues that it was inherent in the nature of Plaintiffs' job, which was coded under DSS Procedure Code 1023z, and from CareOne's employee handbook and conversations Plaintiffs had with Defendant, that they could work only thirteen hours per day, a schedule that would accommodate eight hours for sleep and three hours for meal and rest breaks. Def.'s L.R. 56(a)1 St., ¶¶ 17–18, 21–22, 25–26, 28, 30,

40, 49, 70, 74.  From the parties' conflicting recitations of facts alone, it is clear that there are genuine disputes concerning, at least, whether Plaintiffs experienced sleep interruptions and whether Defendant knew about these interruptions.  These issues are material to Defendant's alleged liability, as explained further below.

The factual dispute over whether Defendant knew that Plaintiffs were working overtime due to interruptions to their sleep, and were not compensated for such work, must go to the jury. Critically, the Second Circuit has held that "an employer's duty under the FLSA to maintain accurate records of its employees' hours is non-delegable."  *Kuebel*, 643 F.3d at 363 (citing 29 U.S.C. § 211(c)).  To that end, "once an employer knows or has reason to know that an employee is working overtime, it cannot deny compensation even where the employee fails to claim overtime hours."  *Holzapfel v. Town of Newburgh*, 145 F.3d 516, 524 (2d Cir. 1998); *see also Kuebel*, 643 F.3d at 363 ("In other words, once an employer knows or has reason to know that an employee is working overtime, it cannot deny compensation simply because the employee failed to properly record or claim his overtime hours.").  As another court in this circuit has explained, if the employer "does not wish that such overtime work be performed, it is the employer who 'has a duty to make every effort to prevent its performance.' . . . The key issue is therefore whether there is evidence in the record showing [the] defendant had actual or constructive knowledge that [the] plaintiff engaged in uncompensated overtime work, regardless of whether [the] plaintiff followed [the employer's] policy about recording overtime."  *Adams v. City of New York*, No. 16-CV-3445 (RA), 2021 WL 1791182, at *5 (S.D.N.Y. May 5, 2021) (citations and other internal quotation marks omitted) (quoting, in part, *Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 288 (2d Cir. 2008)). *See also Foster v. City of New York*, No. 14 Civ. 4142 (PGG), 14 Civ. 9220 (PGG), 2017 WL 11591568, at *20 (S.D.N.Y. Sept. 30, 2017) (explaining that where "supervisors or managers

observe or are aware of employees' uncompensated work, courts impute knowledge to the employer").  Whether an employer had actual or constructive knowledge of uncompensated overtime work "is an issue of fact."  *Adams*, 2021 WL 1791182, at *4 (citations and internal quotation marks omitted).

Here, there is evidence from which a reasonable jury could infer that Defendant knew Plaintiffs were working uncompensated overtime hours, notwithstanding Plaintiffs' failure to record the hours.  Essentially, the parties' dispute over whether Plaintiffs informed Defendant of the interruptions to their sleep turns on a credibility assessment, which is not properly conducted by the Court at summary judgment.  *Kee*, 12 F.4th at 166 ("With respect to the evidence, at the summary judgment stage, the district court is not permitted to make credibility determinations or weigh the evidence . . . for these are 'jury functions, not those of a judge.'" (quoting *Liberty Lobby, Inc.*, 477 U.S. at 255)).  Plaintiffs' assertions as to what Defendant knew are sufficient for their claims of uncompensated interruptions to sleep time to survive the summary judgment stage.  *See Kuebel*, 643 F.3d at 362 (explaining that a plaintiff can show the amount and extent of uncompensated work "based on his own recollection"); *Worley v. City of New York*, No. 17 Civ. 4337 (LGS), 2020 WL 730326, at *5 (S.D.N.Y. Feb. 12, 2020) ("Courts often rely on deposition testimony from employees themselves about what their supervisors knew regarding uncompensated overtime.").

Further, genuine issues of material fact exist as to whether Defendant entered into any agreement(s) with Plaintiffs to exclude sleep time from their pay.  Defendant concedes that Plaintiffs did not sign an express written agreement with CareOne to exclude sleep time from their compensable hours.  He contends, however, that he and Plaintiffs entered into an oral agreement to exclude sleep time by virtue of their employment with CareOne.  Tr. of Oral Arg. at 48–49.

Specifically, he contends that the employee handbook, ECF No. 81-2, informed Plaintiffs that they were "to work no more than 13 hours" per day.  Tr. of Oral Arg. at 49.  *See also id.* at 50 (explaining that the employee handbook states that CareOne does not "pay for non-authorized work time"); Pls.' L.R. 56(a)2 St. ¶ 22 (representing that CareOne "did not pay employees for extended meal, break or personal time").  Defendant explained that he told Plaintiffs that, by continuing their employment with CareOne, they were "agreeing" to "work no more than 13 hours" per day.  Tr. of Oral Arg. at 51.  In effect, Defendant appears to contend that he had an "implied agreement" to exclude sleep time from Plaintiffs' compensable hours.  *See* 29 C.F.R. § 785.22(a).  There are, however, numerous questions of fact material to the compensability of Plaintiffs' sleep time.

For example, at least one court in this district has denied summary judgment because it found disputed questions of fact as to "[e]xactly what documents and interactions even comprise[d] the parties' agreement, whether it was express or implied[.]"  *Kinkead*, 450 F. Supp. 3d at 176. Similarly, the Court cannot grant summary judgment here given that it is far from clear if the parties had any kind of agreement to exclude sleep time and, if so, what the terms of that agreement were.[11]

In addition, the DOL regulations permit an agreement to exclude sleep time only if the employee "can usually enjoy an uninterrupted night's sleep," and only if they can get "at least 5 hours' sleep during the scheduled period[.]"  29 C.F.R. §§ 785.22(a), (b).  Modise's and T. Mmolawa's recitations of their clients' typical sleep schedules raise genuine disputes as to whether they were usually able to enjoy a period of five hours of uninterrupted sleep.  *See Bonn-Wittingham v. Project OHR, Inc.*, 792 F. App'x 71, 75 (2d Cir. 2019) ("Plaintiffs must provide sufficient detail about the length and frequency of their unpaid work to support a reasonable inference that they

---

[11] Presently, Defendant enters into written agreements with employees excluding sleeping time and meal time from their wage calculations.  ECF No. 97 at 24; ECF No. 101 at 8.

worked more than forty hours in a given week." (citation and internal quotation marks omitted)).
Similarly, although M. Mmolawa's interruptions to her sleep appear to have been less frequent,
they constituted entire nights she spent attending to her client in the emergency room without
sleeping at all.  Thus, there are genuine disputes as to whether the sleep periods were bona fide
and regularly scheduled as required under the DOL regulations.  *Kinkead*, 450 F. Supp. 3d at 176
(denying summary judgment because there were "unresolved factual issues regarding whether the
sleep and meal periods at issue here are bona fide and regularly scheduled," and, consequently, the
court could not conclude that sleep time was exempted from the plaintiffs' compensable time under
§ 785.22).

In sum, the Court finds genuine disputes of material fact regarding Plaintiffs' overtime
compensation, with respect to both the overtime work they indisputably performed and the alleged
work they performed during sleep periods, and thus summary judgment is improper at this stage.
The Court thus denies Defendant's motion for summary judgment with respect to Plaintiffs'
overtime compensation claim under the FLSA.

### D.  Statute of Limitations

Defendant also contends that Plaintiffs' claim is barred, in part, by the FLSA's statute of
limitations, and he seeks partial summary judgment on that issue.  The FLSA contains a two-year
statute of limitations; that period is extended to three years where the employer's violation of the
FLSA was "willful."  29 U.S.C. § 255(a).  Relevant here, Plaintiffs began working for Defendant
in March and April of 2017, and Plaintiffs' complaint was filed on June 2, 2020.  ECF No. 1.
Under the ordinary FLSA statute of limitations, Plaintiffs' claim would be time-barred with respect
to Defendant's conduct prior to June 2, 2018.  If they were to demonstrate that Defendant's
violation of the FLSA was willful, their claim would be time-barred only with respect to his

conduct prior to June 2, 2017.  If they demonstrate that they are entitled to equitable tolling of the statute of limitation, then their claim will not be time-barred at all, and they could recover for violations of the FLSA dating back to the beginning of their employment in the spring of 2017.  Defendant contends, consistent with his argument that he did not violate the FLSA at all, that he certainly did not act willfully, and that Plaintiffs are not entitled to equitable tolling.

### 1.   Willfulness

Addressing the issue of willfulness first, the Court agrees with Plaintiffs that there are genuine disputes of fact material to the question of whether Defendant's conduct was "willful," such that the limitation period would extend from two to three years.  "An employer willfully violates the FLSA when it 'either knew or showed reckless disregard for the matter of whether its conduct was prohibited by' the Act."  *Young v. Cooper Cameron Corp.*, 586 F.3d 201, 207 (2d Cir. 2009) (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)).  "Mere negligence is insufficient."  *Id.* (citing *McLaughlin*, 486 U.S. at 133).  "The burden is on the employee to show willfulness."  *Id.*

The question of willfulness with respect to the FLSA's statute of limitations is generally a question for the jury.  *Kuebel*, 643 F.3d at 366; *Kinkead*, 450 F. Supp. 3d at 189.  On this record, a jury could reasonably conclude either that Defendant acted willfully, or that he did not, with respect to his computation of Plaintiffs' regular and overtime wages.  For example, the jury will have to evaluate Defendant's and Plaintiffs' credibility to assess whether Plaintiffs informed Defendant of the interruptions to their sleep and, if so, whether Defendant possessed a willful state of mind when he denied them compensation for their sleep time.  In addition, a reasonable jury could view Defendant's complex and unsubstantiated method for calculating Plaintiffs' food and housing credit as demonstrating a reckless disregard for their rights to minimum and overtime

wages under the FLSA.  On the other hand, a jury could possibly conclude that Defendant acted

in good faith in attempting to calculate the food and housing credit using the information available

to him.  Moreover, Defendant appears to contend that any less-than-perfect compliance with the

FLSA was borne from his unfamiliarity with the new DOL regulations, ECF No. 77-1 at 9, but a

reasonable jury could find that he understood the guidance issued by the DOL and DSS and still

chose to ignore it, *see id.* (discussing ECF No. 95-4, Revised Joint Guidance Regarding USDOL's

Home Care Final Rule (Mar. 31, 2016)).  In other words, Defendant does not "point to evidence

that conclusively shows [his] noncompliance was *not* willful or done with reckless disregard."

*Kinkead*, 450 F. Supp. 3d at 190.  Of course, a reasonable jury could find in Defendant's favor by,

for example, concluding that his calculation method was well-supported, legally sound, and based

in good faith.  Because a jury could reasonably return a verdict for either party, however, the Court

cannot grant Defendant summary judgment on the question of willfulness.  *Kee*, 12 F.4th at 166

(instructing district courts not to "make credibility determinations or weigh the evidence").

### 2.  *Equitable Tolling*

With respect to Plaintiffs' equitable tolling argument, the Court agrees with Defendant that

Plaintiffs are not entitled to equitable tolling and concludes that they cannot recover for alleged

FLSA violations dating from the beginning of their employment in March and April of 2017.

Courts have equitably tolled the FLSA's two- or three-year limitation period "to avoid inequitable

circumstances."  *Asp v. Milardo Photog., Inc.*, 573 F. Supp. 2d 677, 697 (D. Conn. 2008).

Equitable tolling is an "extraordinary measure," however.  *Veltri v. Bldg. Serv. 32B-J Pension

Fund*, 393 F.3d 318, 322 (2d Cir. 2004).  Specifically, courts equitably toll the limitation period

"'as a matter of fairness' where a plaintiff has been 'prevented in some extraordinary way from

exercising his rights, or h[as] asserted his rights in the wrong forum.'"  *Asp*, 573 F. Supp. 2d at

697 (quoting *Miller v. Int'l Tel. & Tel. Corp.*, 755 F.2d 20, 24 (2d Cir. 1985), *cert. denied*, 474 U.S. 851 (1985)).  To that end, courts will generally equitably toll the FLSA's two- or three-year limitation period "where the plaintiff did not consult with counsel during his employment and the employer's failure to post [wage and hour posters in the workplace as required by 29 C.F.R. § 516.4] is not in dispute." *Id.* (collecting cases).  That regulation requires that "[e]very employer . . . shall post and keep posted a notice explaining the Act . . . in conspicuous places in every establishment where such employees are employed so as to permit them to observe readily a copy." 29 C.F.R. § 516.4.  *See also Darowski v. Wojewoda*, No. 3:15-CV-803 (MPS), 2017 WL 6497973, at *6 (D. Conn. Dec. 19, 2017) (citing *Veltri*, 393 F.3d at 324, for the proposition that an employer's "undisputed failure to comply with their obligations under both the FLSA and the CMWA to post notices in the workplace explaining Plaintiff's rights to minimum wage and overtime compensation is an extraordinary circumstance warranting equitable tolling so long as Plaintiff otherwise lacked actual knowledge of those rights").

Here, the record amply demonstrates that Plaintiffs were aware of their rights from the beginning of their employment, and Defendant did not conceal such information from them; equitable tolling is therefore inappropriate.  *See Mark v. Gawker Media, LLC*, No. 13-cv-4347 (AJN), 2016 WL 1271064, at *3 (S.D.N.Y. Mar. 29, 2016) (quoting *Veltri*, 393 F.3d at 323, for the proposition that "equitable tolling is appropriate [w]here [the] defendant is responsible for concealing the existence of [the] plaintiff's cause of action").[12]  Plaintiffs admit that they received a copy of CareOne's employee handbook at the start of their employment, Pls.' L.R. 56(a)2 St. ¶

---

[12] There is split of authority within this circuit regarding whether an employer's failure to post the notices required under the FLSA, alone, is sufficient to warrant equitable tolling, or whether it must be coupled with "some sort of deception" in order to warrant equitable tolling.  *Darowski*, 2017 WL 6497973, at *6 n.7 (discussing split within the circuit).  The Court takes no stance on this split of authority, however, given that it is undisputed that Defendant posted the required notices in the CareOne office and communicated Plaintiffs' rights to them through the employee handbook.

21, which conveyed many of Plaintiffs' minimum and overtime wage rights. *See generally* ECF No. 81-2. Plaintiffs also admit that CareOne's office had posters that communicated information regarding their rights under the FLSA. Pls.' L.R. 56(a)2 St. ¶ 10; ECF Nos. 78-1, 87-4. Moreover, T. Mmolawa brought similar FLSA and CMWA claims against his former employer through the same counsel hired by Plaintiffs here, demonstrating that T. Mmolawa, at least, had consulted with counsel and knew of his rights under both statutes. *See Mmolawa*, 2020 WL 7190819, at *1.

In urging the Court to equitably toll the limitation period, Plaintiffs contend that the DOL regulations required Defendant to post the posters in the individual clients' homes, rather than in the CareOne office, where Plaintiffs rarely spent much time. As an initial matter, Plaintiffs provide no support for this proposition, nor has the Court found any case where an employer of a live-in domestic employee has been required to post FLSA notices inside the individual homes of the employer's clients. In any event, Plaintiffs' assertion does not demonstrate that the extraordinary remedy of equitable tolling is warranted. As explained, Plaintiffs were made aware of their rights through the posters in CareOne's office, the employee handbook, and one Plaintiff's prior experience prosecuting FLSA overtime claims. Even if Defendant was required to post the FLSA posters in each individual client's home, his failure to do so did not prevent Plaintiffs from exercising their rights, given that they were otherwise informed of their rights. *See Asp*, 573 F. Supp. 2d at 697. Accordingly, the Court will grant Defendant's motion for summary judgment with respect to the issue of equitable tolling. Plaintiffs will not be able to recover for any violation of the FLSA committed by Defendant prior to June 2, 2017.

### 3. Summary

In sum, the Court grants in part and denies in part Defendant's request for partial summary judgment with respect to the statute of limitations issue. First, the Court grants his request not to

equitably toll the statute of limitations.  Consequently, Plaintiffs will not be able to recover for any FLSA violations committed by Defendant prior to June 2, 2017.  Second, the Court denies Defendant's request for partial summary judgment with respect to the alleged willfulness of his conduct.  At trial, Plaintiffs will be able to recover for their FLSA claim between June 2, 2017, and June 2, 2018, if they successfully prove that claim and prove that Defendant acted willfully. In addition, Plaintiffs will be able to recover for their FLSA claim between June 2, 2018, and June 2, 2020, if they successfully prove that claim, without a need to prove that Defendant acted willfully.

### E.  Liquidated Damages

Defendant also seeks partial summary judgment with respect to the damages to which Plaintiffs would be entitled if they prevail at trial.  Specifically, Defendant contends that, even if Plaintiffs demonstrate that he violated the FLSA, there is no genuine dispute that he acted reasonably and in good faith and, therefore, Plaintiffs cannot recover the liquidated damages provided by the FLSA.  The Court disagrees.

As noted above, an employer who violates the FLSA is generally liable for the unpaid minimum or overtime wages and "an additional equal amount as liquidated damages." 29 U.S.C. § 216(b).  "Liquidated damages are not a penalty exacted by the law, but rather compensation to the employee occasioned by the delay in receiving wages due caused by the employer's violation of the FLSA."  *Herman*, 172 F.3d at 142.  Courts have discretion to decline to issue a liquidated damages award "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of" the FLSA.  29 U.S.C. § 260; *Reich*, 121 F.3d at 70–71. The employer bears the burden of proving subjective good faith and objective reasonableness, "but

the burden is a difficult one, with double damages being the norm and single damages the exception." *Herman*, 172 F.3d at 142.

For the same reasons there is a genuine issue of material fact regarding Defendant's willfulness relevant to the applicable limitation period, there is also a genuine issue of material fact regarding Defendant's avoidance of liquidated damages. A reasonable jury could conclude that Defendant's method for calculating Plaintiffs' food and housing credit and their overtime wages constituted an objectively reasonable attempt to comply with the FLSA; but the same jury could also conclude that it did not. Moreover, Defendant will need to establish "good faith" by presenting "plain and substantial evidence of at least an honest intention to ascertain what the [FLSA] requires and to comply with it." *Reich*, 121 F.3d at 71. In seeking summary judgment, Defendant contends that he, in good faith, attempted to conform Plaintiffs' work hours to the limitations applicable to them through Procedure Code 1023z. The persuasiveness of this contention will depend on the jury's assessment of his credibility, which this Court cannot assess at the summary judgment stage. *Liberty Lobby, Inc.*, 477 U.S. at 255 ("Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ."). Accordingly, the Court denies summary judgment on the question of whether Plaintiffs will be entitled to recover liquidated damages for any violation of the FLSA by Defendant.

### V.     PLAINTIFFS' CMWA CLAIM

Like the FLSA, the CMWA sets a minimum hourly wage, a maximum number of weekly work hours, and overtime wage requirements. Conn. Gen. Stat. § 31-58 *et seq.  See also Scott v. Aetna Servs., Inc.*, 210 F.R.D. 261, 263 n.2 (D. Conn. 2002) (explaining that the CMWA "provides wage and overtime guarantees similar to the FLSA"). Also like the FLSA, the CMWA is remedial

in nature. *Schoonmaker v. Lawrence Brunoli, Inc.*, 265 Conn. 210, 240 (2003). Moreover, CMWA claims are governed by the same burden-shifting framework applicable to the FLSA, set forth in *Anderson*, 328 U.S. at 686–87. *Schoonmaker*, 265 Conn. at 243. To the extent Defendant's motion seeks judgment in his favor as to Plaintiffs' wage and overtime claims under the CMWA, his motion is denied for the same reasons it is denied as to Plaintiffs' FLSA claim. In addition, Defendant seeks summary judgment with respect to certain issues specific to Plaintiffs' CMWA claim, which the Court considers next.

A. Qualified "Employer"

As noted above, there is no dispute that Defendant qualifies as an "employer" for the purpose of Plaintiffs' FLSA claim. *See supra* note 8. Defendant contends, however, that the record indisputably shows that he does not qualify as an "employer" under the CMWA's definition of that term. The Court disagrees.

The term "employer" as used in the CMWA is defined as "an individual or legal entity who employs any person or who acts in the employer's interest in relation to employees." *Lin v. W & D Assocs., LLC*, No. 3:14-cv-164 (VAB), 2015 WL 7428528, at *7 (D. Conn. Nov. 20, 2015) (internal quotation marks omitted; cleaned up) (quoting Conn. Gen. Stat. §§ 31-58(d), 31-71a(1)). In fleshing out this definition, the Connecticut Supreme Court has "declined to adopt the 'economic reality' test that the Second Circuit uses to define an employer under the FLSA."[13]

---

[13] Specifically, the FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). "When determining whether an individual or entity is an 'employer' under the FLSA, courts evaluate the 'economic reality' of the relationship" by examining a variety of factors relevant to that question. *Sikiotis v. Vitesse Worldwide Chaufeeured Servs., Inc.*, 147 F. Supp. 3d 39, 45–46 (D. Conn. 2015) (quoting *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984)). *See also Herman*, 172 F.3d at 139 (in defining the term employer under the FLSA, "the overarching concern is whether the alleged employer possessed the power to control the workers in question . . . with an eye to the 'economic reality' presented by the facts of each case"). Although the FLSA's definition differs from the definition of "employer" in the CMWA, courts in this district often find that an individual qualifies as an "employer," or does not, for much the same reasons with respect to both definitions. *See, e.g.*, *Tapia v. Mateo*, 96 F. Supp. 3d 1, 5 (D. Conn. 2015); *Lin*, 2015 WL 7428528, at *7; *Morales*, 2010 WL 7865081, at *6; *Tahirou*, 2022 WL 510044, at *10.

*Morales v. Cancun Charlie's Rest.*, No. 3:07-CV-1836 CFD, 2010 WL 7865081, at *6 (D. Conn. Nov. 23, 2010). Rather, an individual "employer" under the CMWA is someone who "possesses the ultimate authority and control . . . to set the hours of employment and pay wages." *Butler v. Hartford Tech. Inst., Inc.*, 243 Conn. 454, 462 (1997). Like the definition of "employer" in the FLSA, however, this definition of "employer" is construed broadly. *Morales*, 2010 WL 7865081, at *6 ("Because the primary purpose of [the CMWA] is remedial in nature, Connecticut courts have broadly construed the definition of employer."); *see also Herman*, 172 F.3d at 139 ("The Supreme Court has emphasized the 'expansiveness' of the FLSA's definition of employer," which is bolstered by the "remedial nature" of the FLSA (quoting *Falk v. Brennan*, 414 U.S. 190, 195 (1973))).

Although Plaintiffs were employed by CareOne, Defendant, as an individual, can constitute an "employer" under the CMWA if he was "the ultimate responsible authority to set the hours of employment and to pay wages" to Plaintiffs. *Butler*, 243 Conn. at 463–64. A reasonable jury reviewing this record could conclude that Defendant had such authority and control, particularly given that it is undisputed that Defendant was the sole authority to pay Plaintiffs' wages. Specifically, Defendant does not suggest that the clients had any kind of compensation arrangement directly with their PCAs, nor that another individual employed by CareOne was responsible for reviewing Plaintiffs' hours and calculating their wages.

Instead, Defendant contends he is not liable under the CMWA because *supervision* of the PCAs was shared between himself and the individual clients. Even accepting this contention, however, a reasonable jury could find that Defendant had the ultimate authority and control over the specific employment terms that allegedly caused Plaintiffs' CMWA rights to be violated. By Defendant's own admissions, he at least attempted to control Plaintiffs' hours of employment by

directing them not to work during their sleep time, even if the clients required Plaintiffs' assistance during that time.  Thus, to the extent he claims that the clients had exclusive control over Plaintiffs' work hours, the record presents a genuine dispute of fact on that issue.  In addition, Defendant does not argue that control over Plaintiffs' wages was shared with the individual clients or anyone else employed at CareOne.  A reasonable jury could find that defendant was an "employer" given that he reviewed Plaintiffs' timesheets and was the responsible individual for paying their regular and overtime wages.  *See Butler*, 243 Conn. at 465 (affirming trial court's findings that the defendant was an employer because he reviewed the employees' overtime hours, was the only individual who "could approve wage payments," and, in refusing to pay overtime, "was the cause of the failure to compensate" the plaintiff).  Accordingly, Defendant's motion for summary judgment is denied with respect to his claim that he is not an employer under the CMWA.

### B.  Statute of Limitations

Defendant also contends that Plaintiffs' claims are barred, in part, by the CMWA's statute of limitations.  The Court agrees.  The CMWA contains a two-year statute of limitations, and that period is extended to three years "if the plaintiff has filed a complaint for failure to pay wages with the Labor Commissioner[.]"  *Asp*, 573 F. Supp. 2d at 696; Conn. Gen. Stat. § 52-596.  Here, Plaintiffs do not contend that they filed a complaint with the state Labor Commissioner, so their CMWA claims do not warrant the extended three-year limitation period.

With respect to equitable tolling, courts have equitably tolled the limitations period under the CMWA "where the plaintiff did not consult with counsel during his employment and the employer's failure to post [wage and hour posters in the workplace] is not in dispute."  *Asp*, 573 F. Supp. 2d at 697; *see also Darowski*, 2017 WL 6497973, at *6.  For the same reasons that Plaintiffs are not entitled to equitable tolling with respect to their FLSA claim, explained above,

Plaintiffs are not entitled to equitable tolling with respect to their CMWA claim.  Accordingly, the Court grants Defendant's motion for summary judgment in part and concludes that the limitation period with respect to Plaintiffs' CMWA claim will be restricted to the two years prior to the date Plaintiffs filed their complaint, specifically, since June 2, 2018.

## VI.    DEFENDANT'S STATE LAW COUNTERCLAIMS

As noted above, Defendant filed a sixteen-count counterclaim against Plaintiffs, ECF No. 18.  Defendant claims that each Plaintiff committed intentional misrepresentation, negligent misrepresentation, negligence, and negligence *per se* or statutory negligence by failing to properly report their working hours and sleep time interruptions.  *Id.* at 8–23.  In essence, Defendant contends that Plaintiffs failed to inform him that their clients required more care than a PCA authorized by Procedure Code 1023z was meant to provide.  Had Plaintiffs informed him that their clients required overnight care, the argument goes, the clients would have been categorized as requiring three PCAs to provide twenty-four-hour care, and thus CareOne would have received greater reimbursement from DSS for those services.

### A.  Legal Standard

The following principles of Connecticut common law are relevant to Defendant's counterclaims.  Intentional misrepresentation, or common law fraud, is composed of four elements: "(1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury."  *Sturm v. Harb Dev., LLC*, 298 Conn. 124, 142 (2010) (citation and internal quotation marks omitted); *accord White v. Wells Fargo Bank, N.A.*, No. 3:18-cv-1676 (VAB), 2019 WL 3334533, at *7 (D. Conn. July 25, 2019).

An action for negligent misrepresentation traditionally requires a plaintiff to establish "(1) that the defendant made a misrepresentation of fact (2) that the defendant knew or should have known was false, and (3) that the plaintiff reasonably relied on the misrepresentation, and (4) suffered pecuniary harm as a result." *Nazami v. Patrons Mut. Ins. Co.*, 280 Conn. 619, 626 (2006); *accord Petrucelli v. Palmer*, 596 F. Supp. 2d 347, 371 (D. Conn. 2009). *See also Kramer v. Petisi*, 285 Conn. 674, 681 (2008) (quoting Restatement (Second) of Torts, § 552 (1977)).

The primary difference between these causes of action is the declarant's state of mind when making the false statement. Because fraud is an intentional tort, the false representation must be "knowingly untrue, or made without belief in its truth, or recklessly made and for the purpose of inducing action upon it" to satisfy the requirements of the tort of intentional misrepresentation. *Sturm*, 298 Conn. at 142 (quoting *Kramer*, 285 Conn. at 684 n.9). A negligent misrepresentation, by contrast, is one made without an exercise of reasonable care to ascertain the truth, which could encompass an "innocent" misrepresentation. *Kramer*, 285 Conn. at 681.

The elements of an ordinary negligence cause of action "are well established: duty; breach of that duty; causation; and actual injury." *McDermott v. State*, 316 Conn. 601, 609 (2015) (citation and internal quotation marks omitted); *accord White*, 2019 WL 3334533, at *5. Negligence *per se* effectively engrafts a particular statutory standard onto the standard of care imposed by the duty element of a negligence cause of action. *Gore v. People's Sav. Bank*, 235 Conn. 360, 376 (1995); *accord Telkamp v. Vitas Healthcorp. Atl.*, No. 3:15-CV-726 (JCH), 2016 WL 777906, at *10 (D. Conn. Feb. 29, 2016). In other words, the jury needs only to "decide whether the relevant statute or regulation has been violated. If it has, the defendant was negligent as a matter of law." *Gore*, 235 Conn. at 376. Negligence *per se* is appropriate where (1) the

plaintiff was "within the class of persons protected by" the relevant statute, and (2) the injury suffered "is of the type that the statute was intended to prevent." *Id.* at 368–69.

B. Discussion

1. *Intentional and Negligent Misrepresentation Claims*

The Court finds genuine disputes of material fact that preclude summary judgment with respect to Defendant's common law counterclaims for intentional and negligent misrepresentation. Regarding these claims, Defendant contends that Plaintiffs untruthfully failed to document interruptions to their sleep time, and that he relied on their representations that the clients slept soundly throughout the night to obtain a lower reimbursement from DSS than he otherwise would have obtained had he known that the clients required a higher degree of care. These claims hinge at least in part on Defendant's contention that Plaintiffs either falsely represented to him that their clients slept soundly throughout the night, or failed to inform him that their clients were in fact waking and requiring assistance throughout the night.

As explained above, however, there are genuine disputes of material fact regarding these issues, particularly as to whether Plaintiffs informed Defendant that the clients were routinely requiring assistance throughout the night. Although it is undisputed that Plaintiffs did not document the interruptions to their sleep time, a jury must, at the very least, resolve the conflicting evidence in the record regarding whether Defendant nevertheless knew that Plaintiffs' clients were interrupting their sleep and whether Plaintiffs did anything to either intentionally or negligently mislead Defendant in this regard. Questions of fact also remain as to the nature and degree of any damages Defendant may have incurred, if indeed intentional or negligent misrepresentations occurred. These tasks require an assessment of Defendant's and Plaintiffs' credibility, which the Court cannot do at the summary judgment stage. *Liberty Lobby, Inc.*, 447 U.S. at 254. Defendant's

motion for summary judgment on his intentional and negligent misrepresentation claims must therefore be denied.

### 2.    *Negligence and Negligence* Per Se *Claims*

Defendant's negligence and negligence *per se* claims will also ultimately require a jury to resolve the conflicting evidence in the record regarding whether Plaintiffs in fact informed Defendant of the interruptions to their sleep or whether they were somehow negligent in this regard.   For primarily the same reasons Defendant's motion for summary judgment on his intentional and negligent misrepresentation claims is denied, Defendant's motion for summary judgment on his negligence and negligence *per se* claims is likewise denied.

These claims, however, raise further complications.  In their brief opposing Defendant's motion for summary judgment, Plaintiffs assert that "there is no evidence in the record" that would demonstrate that Plaintiffs owed him a duty of care, which would be required to prove both claims. ECF No. 98 at 39.  Plaintiffs therefore request that the Court "terminate and dismiss" these claims as unsupported by the record.  ECF No. 98 at 39.

Plaintiffs do not identify, however, which procedural basis supports this request.  Federal Rule of Civil Procedure 12(h)(2) permits a party to raise the defense of failure to state a claim upon which relief can be granted at various stages of the case, including at trial.  Thus, a court may, upon motion, dismiss a claim for failure to state the claim at the summary judgment stage.  *Jackson v. AFSCME Loc. 196*, No. CIVA3:07CV471 JCH, 2010 WL 1286771, at *8 (D. Conn. Mar. 29, 2010) (collecting cases).  If the defense addresses the legal basis of the claim, the court will consider whether the allegations of the relevant pleading state a viable claim under the legal standard applicable to a motion to dismiss or motion for judgment on the pleadings pursuant to Federal Rules of Civil Procedure 12(b)(6) or 12(c), respectively.  *See Schwartz v. Compagnie Gen.*

*Transatlantique*, 405 F.2d 270, 273 (2d Cir. 1968); *Leary v. Manstan*, No. 3:13-CV-00639 (JAM), 2015 WL 521497, at *5 (D. Conn. Feb. 9, 2015). Alternatively, if the defense addresses the factual sufficiency of the claim, the court will consider whether there is a genuine dispute of material fact relevant to the defense under the summary judgment standard of Federal Rule of Civil Procedure 56. *Jackson*, 2010 WL 1286771, at *8 (quoting *Kornblum v. St. Louis Cnty., Mo.*, 48 F.3d 1031, 1038 (8th Cir.1995) (opinion vacated on other grounds)).

Here, Plaintiffs have not filed a separate motion specifying the basis of the relief they seek. They ask the Court to "dismiss and terminate" the counterclaims, which suggests that they intend to attack the legal sufficiency of the counterclaims as pled. But they discuss only the evidence in the record, not the allegations of Defendant's pleading. To the extent they actually seek summary judgment in their favor on the counterclaims, they have not filed a motion or otherwise complied with Local Rule 56. In short, as Plaintiffs' request for relief lacks clarity and is procedurally unsound, the Court will not grant the request.

For the reasons that follow, however, the Court advises Defendant that the Court will consider *sua sponte* granting summary judgment in Plaintiffs' favor on Defendant's negligence and negligence *per se* counterclaims, despite that Plaintiffs have not so moved, pursuant to the Court's authority under Federal Rule of Civil Procedure 56(f). That Rule provides that a district court may, after "giving notice and a reasonable time to respond," grant summary judgment for a nonmovant or "consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute." Fed. R. Civ. P. 56(f). Courts in this district have *sua sponte* granted summary judgment if, "after giving notice and a reasonable time to respond and after identifying for the parties material facts that may not be genuinely in dispute," the record "still shows no genuine issue as to any material fact, and a party is entitled to judgment as a matter

of law." *Melillo v. Brais*, No. 3:17-cv-520 (VAB), 2019 WL 1118091, at *6 (D. Conn. Mar. 11, 2019) (cleaned up) (quoting *In re 650 Fifth Ave. & Related Props.*, 830 F.3d 66, 96 (2d Cir. 2016)); *see also Jackson Nat'l Life Ins. Co. v. Roosen*, No. 3:18-cv-934 (MPS), 2019 WL 1980358, at *6 (D. Conn. May 3, 2019).   The judge's function in this inquiry, as when a party has moved for summary judgment pursuant to Rule 56(a), is to determine "whether there is a need for a trial— whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Melillo*, 2019 WL 1118091, at *6 (quoting *Liberty Lobby, Inc.*, 477 U.S. at 249).

Here, Defendant's negligence claims, like his misrepresentation claims, pertain largely to Plaintiffs' alleged failures to report interruptions in sleep time to Defendant.  ECF No. 18 ¶¶ 59– 63, 117–22.  To prove his negligence claims, Defendant must first establish that Plaintiffs owed him a duty.  *See Ruiz v. Victory Props., LLC*, 315 Conn. 320, 328 (2015) ("Duty is a legal conclusion about relationships between individuals . . . and imperative to a negligence cause of action").  But Defendant cites to no source, factual or legal, that establishes that Plaintiffs owed him any duty of care.  He simply argues that "one of the duties of a PCA is to document and report accurate activities as part of their employment."  ECF No. 77-1 at 22.  As Plaintiffs note, by way of citation to *Ruiz*, "[t]he ultimate test of the existence of the duty to use care is found in the foreseeability that harm may result if it is not exercised."  315 Conn. at 328.  Defendant has pointed to no evidence in the record, either in his opening or reply briefs, suggesting that the harm he alleges—loss of increased income from DSS reimbursement had he known Plaintiffs were working twenty-four hours per day, instead of thirteen or fourteen hours per day—was in any way foreseeable to Plaintiffs.  Because the question of whether a duty exists "is a question of law for the court," and because it is preliminary to the factual question of whether that duty was breached,

*id.*, the Court will consider whether to grant summary judgment in Plaintiffs' favor with respect to Defendant's negligence claims on that basis, after giving him an opportunity to respond.

Defendant also seems to fundamentally misunderstand the negligence *per se* cause of action. Defendant claims that all three named Plaintiffs were negligent *per se* because they allegedly violated Connecticut General Statutes §§ 17a-412(a) and 17b-450, which pertain to mandatory reporting of abuse, neglect, exploitation, and abandonment of residents in long-term care facilities. Defendant also claims Modise committed elder abuse, in violation of these laws, by failing to seek medical help for her client's sleep problem.[14] ECF No. 18 ¶¶ 54–58. Defendant further alleges Plaintiffs T. Mmolawa and M. Mmolawa were negligent *per se* because they abandoned clients during work hours. *Id.* ¶¶ 79–95, 117–22. Finally, Defendant alleges that T. Mmolawa violated Connecticut General Statutes § 52-595, which extends the statute of limitations when a person fraudulently conceals the existence of a cause of action from another to whom such person may be liable. *Id.* ¶ 83.

But Defendant does not have a negligence *per se* cause of action simply because Plaintiffs allegedly violated other state laws, if he cannot also show that he is within the "class of persons protected by" the statutes he cites and that his injury is "of the type which the statute was intended to protect." *Gore*, 235 Conn. at 376. Here, assuming that Connecticut General Statutes §§ 17a-412(a), 17b-450, and 52-595 are statutes that could support negligence *per se* claims, Defendant has put forward no evidence showing that he is within the class of persons protected by these statutes or that his injury is of the type that these statutes were intended to protect. Indeed, the mandatory reporting statute appears to protect primarily the residents of long-term facilities. To

---

[14] In his moving papers, Defendant has argued nothing about his elder abuse theory of negligence *per se* against Plaintiff Modise, suggesting to the Court that he may be abandoning this theory. *See* ECF No. 77-1 at 22–25 (discussing only Modise's failure to report interruptions in her sleep time).

the extent the fraudulent concealment statute of limitations "protects" anyone, it appears to protect people who, due to the fraud of another, did not initially know that a cause of action has accrued in their favor.  Courts considering whether a litigant was within the class of persons protected by a statute typically "look to the language of the statute and to the legislative history and purposes underlying the provision's enactment."  *Gore*, 235 Conn. at 380; *see also Law v. Camp*, 116 F. Supp. 2d 295, 303 (D. Conn. 2000) (considering the text and legislative history of a statute to determine whether it establishes a duty of care to support a negligence *per se* claim).  It is unclear whether Defendant falls within the class of persons any of these statutes is intended to protect. Because this is a question of law, the Court will consider whether to grant summary judgment in Plaintiffs' favor with respect to Defendant's negligence *per se* claim on this issue, after giving Defendant an opportunity to respond.

In sum, the Court DENIES Defendant's motion for summary judgment with respect to his counterclaims.  In addition, the Court advises Defendant that it will consider whether to exercise its authority under Federal Rule of Civil Procedure 56(f) to grant summary judgment in Plaintiffs' favor on Defendant's negligence and negligence *per se* counterclaims on the bases explained above.  In order to do so, the Court must give the parties a reasonable opportunity to respond. Therefore, **the Court gives Defendant fourteen days to show cause why Plaintiffs should not be granted summary judgment as to his negligence and negligence *per se* counterclaims.**  By **November 15, 2022,** Defendant shall file a memorandum of law no longer than twenty double-spaced pages, a Statement of Undisputed Material Facts no longer than ten double-spaced pages, and any evidentiary materials in support.  Plaintiffs may respond within fourteen days after Defendant's submission.  Their memorandum of law shall not exceed fifteen pages, and they shall file a Statement Responding to Defendant's Statement of Undisputed Material facts, no longer

than twice the length of Defendant's Statement, admitting or denying each material fact identified

therein.  Defendant may file a reply brief, no longer than ten double-spaced pages, within seven

days after Plaintiffs' submission.

### VII.   CONCLUSION

As explained above, the Court GRANTS IN PART and DENIES IN PART Defendant's

Motion for Summary Judgment, ECF No. 77.  Specifically, the Court GRANTS Defendant's

motion and finds no genuine dispute of material fact that:

- Plaintiffs' FLSA claims are time-barred with respect to violations that occurred prior to
  June 2, 2017; and

- Plaintiffs' CMWA claims are time-barred with respect to violations that occurred prior to
  June 2, 2018.

The Court DENIES Defendant's motion and finds genuine disputes of material fact with

respect to the following issues:

- Whether Defendant failed to compensate Plaintiffs with the required minimum and
  overtime wages required by the FLSA and CMWA;

- Whether Defendant was entitled to credit Plaintiffs' wages with the claimed value of food
  and housing provided by the clients;

- Whether Plaintiffs are entitled to overtime compensation for the time their sleep was
  interrupted;

- Whether Defendant "willfully" violated the FLSA, such that Plaintiffs' FLSA claims
  between June 2, 2017, and June 2, 2018, are not time-barred;

- Whether Defendant acted reasonably and in good faith, such that Plaintiffs would not be
  entitled to liquidated damages under the FLSA;

- Whether Defendant qualifies as an "employer" under the CMWA; and

- Whether Plaintiffs committed intentional and negligent misrepresentation.

In addition, the Court denies Defendant's motion for summary judgment on his counterclaims for negligence and negligence *per se*.  The Court defers ruling as to whether to enter summary judgment for Plaintiffs on Defendant's counterclaims for negligence and negligence *per se* pursuant to Federal Rule of Civil Procedure 56(f), pending the submission of additional briefing from the parties outlined above.

In addition, as noted above, the Court DENIES Defendant's Motion for Leave to File a "Response" to the Transcript, ECF No. 121.  After considering the additional briefing from the parties regarding Defendant's negligence and negligence *per se* counterclaims, the Court will schedule a status conference to discuss a schedule for trial.

**SO ORDERED** at Hartford, Connecticut, this 1st day of November, 2022.


  */s/ Sarala V. Nagala*  
SARALA V. NAGALA  
UNITED STATES DISTRICT JUDGE